SUTTON, J., delivered the opinion of the court, in which KENNEDY, J., joined. MOORE, J. (pp. 825-29), delivered a separate concurring opinion.
SUTTON, Circuit Judge.
Biniam Berhane, a native and citizen of Ethiopia, claims that throwing rocks at police during anti-government demonstrations amounts to a political crime, which permits him to seek asylum, as opposed to a “serious nonpolitical crime,” which bars him from seeking asylum and withholding of removal. 8 U.S.C. §§ 1158(b)(2)(A)(iii), *820 1231(b)(3)(B)(iii). The Board of Immigration Appeals rejected Berhane’s argument, concluding that he had committed a “serious nonpolitical crime.”
At first glance, there are three seemingly good reasons for upholding this decision. The Board’s interpretation of the Illegal Immigration Reform and Immigrant Responsibility Act receives Chevron deference. INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). Its fact-based assessments of an applicant’s qualifications for asylum receive deferential “substantial evidence” review. INS v. Elias-Zacarias, 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). And Berhane’s rock-throwing was prolific (he participated in 20 such demonstrations) and dangerous (the demonstrators “probably” injured police officers, JA 279).
But the Board’s two-page opinion, one paragraph of which bears on this point, raises more questions than it answers. Although the government acknowledged at oral argument that not all rock throwing amounts to a “serious nonpolitical crime,” the Board’s fleeting assessment of Berhane’s situation offers little explanation for why he falls on the wrong side of the rock-throwing line. And although the Board’s definition of a “serious nonpolitical crime” is well established (whether the criminal nature of the conduct outweighs its political motives), the Board and the courts of appeals have not issued any decisions (to our knowledge) in which rock throwing was the principal criminal act. For these reasons and those elaborated below, we vacate the Board’s decision and remand the matter to the Board for further consideration and further explanation of its position.
I.
Ethiopia held contested parliamentary elections in May 2005. Before the elections, Berhane and his brother joined a prominent government-opposition group, the Coalition for Unity and Democracy. Spurred by the Coalition’s mission to reduce executive-branch authority and “promote democratization and human rights,” JA 201, Berhane taught others about the group and recruited new members to the cause.
The Coalition’s political agitation increased after the parliamentary elections. Refusing to accept what they perceived as fraudulent election results, Coalition members participated in a series of street protests. In response, according to the State Department’s country report, police shot and killed protestors from June 6 through June 8. Between November 1 and November 7, the report adds, police forces opened fire on demonstrators who were throwing rocks and who may have had machetes and grenades. Berhane joined more than 20 post-election street demonstrations to “fight[ ] [for] ... power and democracy and justice ... [in] Ethiopia,” JA 74, 76, though the record does not indicate whether he attended any of the protests mentioned in the country report.
Soon after the election, the Ethiopian government arrested many Coalition members, including Berhane’s brother, whom the police arrested in February 2006 and whom his family has not seen since. After his brother’s arrest, Berhane fled the country, and soon thereafter the police arrested Berhane’s father.
In March 2006, Berhane illegally entered the United States through Mexico. When the Department of Homeland Security caught up with him, it ordered him to appear at a removal proceeding. Conceding removability, Berhane filed for asylum, withholding of removal and protection under the Convention Against Torture. Berhane asked for asylum on the basis of political opinion, claiming that he feared *821 harm if he returned to Ethiopia due to his prior involvement in the Coalition.
During his hearing before an Immigration Judge, Berhane admitted that he threw rocks at police and their vehicles during street protests. He also used rocks to set up barricades on the streets, which kept police vehicles away from the demonstrations. Others protesting alongside Berhane set tires on fire and may have had grenades, though Berhane denied taking part in these more violent activities. When asked whether his rock throwing was the reason the police wanted to arrest him, Berhane agreed that it could be one reason, but he also thought that they wanted him because he “participat[ed] in the neighborhood and recruit[ed] members of [the Coalition].” JA 76.
The Immigration Judge denied Berhane’s petition. Although the IJ expressed doubt about Berhane’s credibility, he ultimately did not make an adverse credibility finding. “The larger concern,” the IJ concluded, was that Berhane had thrown rocks at police, JA 210, which amounted to a “serious nonpolitical crime” and which made Berhane statutorily ineligible for asylum and withholding of removal. See 8 U.S.C. §§ 1158(b)(2)(A)(iii), 1231 (b)(3)(B)(iii). The IJ also denied Berhane’s claim under the Convention Against Torture.
The Board of Immigration Appeals affirmed, agreeing that Berhane had committed a “serious nonpolitical crime,” which barred him from receiving asylum or withholding of removal. It also rejected Berhane’s claim under the Torture Convention. In his petition for review, Berhane contests only the Board’s conclusion that he committed a “serious nonpolitical crime.”
II.
Although neither party challenges our authority to consider Berhane’s petition, we have an “independent obligation” to ensure jurisdiction before pressing forward. Hertz Corp. v. Friend, — U.S. -, 130 S.Ct. 1181, 1193, — L.Ed.2d - (2010). Congress has removed some immigration decisions of the Attorney General from our jurisdiction — generally those “specified under [8 U.S.C. §§ 1151— 1381] to be in the discretion of the Attorney General.” 8 U.S.C. § 1252(a)(2)(B)(ii). Section 1158(b)(2)(A), the first provision at issue, says that an alien is ineligible for asylum if “the Attorney General determines that ... there are serious reasons for believing that,” prior to arriving in the United States, “the alien ... committed a serious nonpolitical crime.” Id. § 1158(b)(2)(A) (emphasis added). The second provision at issue, § 1231(b)(3)(B), which speaks to the availability of withholding of removal, says that an alien is ineligible for relief if “the Attorney General decides” he committed a serious nonpolitical crime (emphasis added). The question is: Does the Attorney General’s “determin[ation]” or “deci[sion]” that an act is a serious nonpolitical crime amount to an act of “discretion,” eliminating our authority to review the decision?
We think not. The reach of the Act’s jurisdiction-stripping provision extends only to those decisions “specified” by statute “to be in the [Attorney General’s] discretion.” 8 U.S.C. § 1252(a)(2)(B)(ii). To “specify” that a decision belongs to the Attorney General’s discretion requires more than a hint. “ ‘[S]pecify’ means to ‘name or state explicitly or in detail.’ ” Kucana v. Holder, — U.S. -, 130 S.Ct. 827, 834 n. 10, - L.Ed.2d - (2010) (quoting Webster’s New Collegiate Dictionary 1116 (1974)). And §§ 1158(b)(2)(A) and 1231(b)(3)(B) contain no such designation.
*822 The sections, it is true, say that whether an alien committed a serious nonpolitical crime is something the Attorney General “determines,” 8 U.S.C. § 1158(b)(2)(A), and “decides,” id. § 1231(b)(3)(B). But empowering the Attorney General to “determine[ ]” (or for that matter “decide[ ]”) something no more “specifies]” “discretion” than empowering the Attorney General to exercise any number of responsibilities under the Act, be they interpretations of the Act, adjudications under the Act, the adoption of rules under the Act or anything else that might count as an administrative “determination” under the Act. No doubt, the courts give broad deference to the Attorney General in each of these areas — deference that in turn allows the Attorney General to exercise considerable discretion. See Aguirre-Aguirre, 526 U.S. at 424-25, 119 S.Ct. 1439. But just because the courts give the Attorney General broad discretion in an area does not mean that Congress has “specifically]” committed the area to the Attorney General’s discretion. Otherwise, our lack of authority to review some immigration decisions of the Attorney General would become the unyielding rule. If “ ‘discretion’... mean[t] nothing more than the application of facts to principles” or any of these other traditional actions of the Attorney General, it would be difficult to envision “any action by the Attorney General” that would not get caught in the jurisdiction-stripping provision’s orbit. Soltane v. Dep’t. of Justice, 381 F.3d 143, 148 n. 3 (3d Cir.2004) (internal quotations omitted). That is not what Congress had in mind. See Alaka v. Att’y Gen. of the U.S., 456 F.3d 88, 96 (3d Cir.2006) (the Attorney General’s authority to “decide” whether an alien committed a “particularly serious crime,” 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1242(b)(3)(B)(ii), is not a discretionary decision over which courts of appeals lack jurisdiction); Nethagani v. Mukasey, 532 F.3d 150, 154-55 (2d Cir. 2008) (same).
Kucana v. Holder, — U.S. -, 130 S.Ct. 827, •— L.Ed.2d -, reinforces this conclusion. In holding that a decision committed to the Attorney General’s “discretion” by regulation does not satisfy the prerequisite that Congress “specif[y]” by statute the Attorney General’s “discretion” over an issue, id. at 831, Kucana admonishes the courts to read the Act’s jurisdiction-stripping provisions narrowly — in “accord[ ] with [the] traditional understanding ... that executive determinations generally are subject to judicial review.” Id. at 839. It takes “clear and convincing evidence,” Kucana says, “to dislodge the presumption” of judicial review over agency actions. Id. (internal quotation marks omitted). No such evidence appeared there, and none appears here. Congress committed many issues under the Act to the Attorney General’s “discretion,” showing that the national legislature understood what it must do to place a decision of the Attorney General out of our reach— and showing just as clearly that it did not do so here. See, e.g., 8 U.S.C. § 1182(d)(ll) (“the Attorney General may, in his discretion” waive inadmissibility of illegal aliens); id. § 1186a(c)(4) (a “hardship waiver” based on a “good faith” marriage is “within the Attorney General’s discretion”); id. § 1227(a)(1)(H) (a waiver of inadmissibility for misrepresentations is within “the discretion of the Attorney General”).
One of our unpublished decisions, we acknowledge, held that whether an alien committed a serious nonpolitical crime was a “discretionary determination” over which we lacked jurisdiction. Celaj v. Ashcroft, 121 Fed.Appx. 608, 610-11 (6th Cir.2005). But that case was decided before Kucana, to say nothing of being decided through a non-precedential opinion. With the benefit of Kucana!s reasoning, we think that giving the Attorney General authority to “determine[ ]” the serious nonpolitical crime *823 bar’s applicability is insufficient to “specify” that the decision belongs to the Attorney General’s “discretion.”
III.
Did the Board properly conclude that Berhane’s activities in Ethiopia— namely, throwing rocks at the police during demonstrations — constitute serious nonpolitical crimes? In trying to answer this question, the parties (and we) share some common ground. A finding that Berhane committed a “serious nonpolitical crime” renders him ineligible for asylum or withholding of removal. 8 U.S.C. §§ 1158(b)(2) (A) (iii), 1231(b)(3)(B)(iii). The Illegal Immigration Reform and Immigrant Responsibility Act delegates to the Attorney General, and ultimately (through the Attorney General) to the Board, authority to determine the meaning of a “serious nonpolitical crime.” See 8 U.S.C. § 1158(b)(2)(A); see Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Aguirre-Aguirre, 526 U.S. at 424-25, 119 S.Ct. 1439. The Board has permissibly interpreted this language to mean that a crime is “serious” and “nonpolitical” when “the criminal nature” of the act “outweigh[s] its political nature.” Aguirre-Aguirre, 526 U.S. at 431, 119 S.Ct. 1439; see In re McMullen, 19 I. & N. Dec. 90, 97-98 (BIA 1984). As applied to Berhane, this inquiry raises factual questions about the nature of his conduct and legal questions about the appropriate circumstances to consider in the balance. The former questions receive “substantial evidence” review, requiring us to uphold the agency’s finding unless “the evidence not only supports [a contrary] conclusion, but indeed compels it.” Elias-Zacarias, 502 U.S. at 481 n. 1, 112 S.Ct. 812. The latter questions receive Chevron review, requiring us to uphold the Board’s determination as long as it represents a permissible reading of the statutory bar for “serious nonpolitical crimes.” See Aguirre-Aguirre, 526 U.S. at 424-25, 119 S.Ct. 1439.
As gauged by these considerations, the question is whether the Board permissibly determined that “the criminal nature” of Berhane’s actions “outweigh[ed]” their “political” components. On one side of the scales, there were ample bases for finding that his actions were “criminal.” Berhane’s testimony confirms as much. His actions were violent: He recalled “hit[ting] the police” with rocks and “disappearing] from [the] area” when he saw that they were in “bad condition.” JA 91. They were destructive: In addition to taking aim at the police, Berhane “sometimes” threw rocks “to crash some cars,” which he qualified only by saying that he targeted government vehicles. JA 92. And they were frequent: He threw rocks during 20 demonstrations, and he ultimately threw rocks at the police “countless” times. JA 89. Taken together, these facts support the agency’s finding that Berhane’s acts were criminal in nature.
On the other side of the scales, the record establishes a political motive for Berhane’s actions. “The main purpose of throwing the rocks,” Berhane explained, “was ... to give a lesson to the policemen that [he was] for democracy and for equality of Ethiopian people.” JA 89-90. And the protestors, Berhane says, used force “to show that [the protestors were] supporting the [Coalition’s] principles” and “to oppose” the government. JA 90.
Matters grow more complicated when we consider the Board’s explanation for determining that the criminal aspects of Berhane’s actions “outweighed” the political motives for engaging in them. Here is what the Board said:
In reaching his determination that the respondent was barred from asylum and withholding of removal, the Immigration *824 Judge stated that in view of the scope of the respondent’s activities, the political aspects were outweighed by the criminal law aspects. Contrary to the respondent’s appellate contentions, the Immigration Judge’s findings of fact have not been shown to be clearly erroneous. Further, we find the Immigration Judge properly applied the approach taken by the Board in Matter of McMullen in determining that the political aspects were outweighed by the criminal law aspects. We are not persuaded to disturb the Immigration Judge’s decision.
JA 279 (citations omitted). In a footnote to this paragraph, the Board quoted (with apparent approval) this aspect of the Immigration Judge’s decision:
The Immigration Judge would understand if respondent took part in a peaceful demonstration or took part in a demonstration calling to international attention the actions of the Ethiopian government in its possible intimidation of voters and electoral leaders. Instead, respondent testified that he took part in at least 20 demonstrations in which rocks were thrown, tires burned, and boulders placed in such a way that the police would be impeded in their activities. By throwing these rocks, the demonstrators damaged or destroyed public and private property and probably injured police officers as well.
Id. at n. 2.
The Board’s brief analysis is susceptible of at least two readings. One is that rock throwing during political demonstrations invariably will amount to a “serious nonpolitical crime.” A portion of the Immigration Judge’s decision quoted by the Board seems to embrace this interpretation, as the IJ distinguishes between permissible “peaceful demonstration[s]” and impermissible “demonstrations in which rocks were thrown.” The other possibility is that rock throwing by itself is not what sinks Berhane’s application. It is the number of demonstrations in which he threw rocks (20), combined with other activities (burning tires and placing boulders in the streets) and the consequences of all of Berhane’s activities at the demonstrations (damage to public and private property and the fact that police officers “probably” were “injured”).
At oral argument, we asked the Attorney General’s representative whether the first interpretation was the correct one— whether the Board treated all rock throwing at antigovernment demonstrations as a “serious nonpolitical crime.” Counsel responded, quite reasonably, that, in weighing the criminal and political nature of an applicant’s actions at a demonstration, the Board makes case-by-case findings and does not believe that all rock throwing amounts to an asylum-barring crime. It is tempting to accept counsel’s assurances, to invoke the Board’s broad discretion in deciding who has committed a “serious nonpolitical crime,” see Aguirre-Aguv"re, 526 U.S. at 424, 119 S.Ct. 1439, and to leave it at that. But several competing considerations suggest that the better course is to ask the Board to clarify its decision.
To our knowledge, this is the first Board or Court of Appeals decision to deal with a conventional, if nonetheless violent, form of street protest — rock throwing — one that the State Department reports, to say nothing of the nightly news, indicate happens with some regularity in other countries. The Board’s original decision in this area in 1984, In re McMullen, 19 I. & N. Dec. at 92-93, 95, dealt with far more serious criminal acts — terrorist bombing directed at civilian and government targets — which not only implicate the bar for “serious nonpolitical crimes,” but also implicate the anti-persecution bar, 8 U.S.C. § 1101(a)(42); McMullen, 19 I. & N. Dec. at 95. Other more recent decisions are at *825 least one step removed from this one in terms of criminality and risks to public safety. In Chay-Velasquez v. Ashcroft, the criminal acts of burning buses, breaking windows and fighting with the police outweighed the political motive of protesting “important political and social issues.” 367 F.3d 751, 754-55 (8th Cir.2004). In Efe v. Ashcroft, the criminal act of killing a police officer at a rally outweighed the alien’s political motive, even where the police were allegedly violent toward the protestors. 293 F.3d 899, 905-06 (5th Cir. 2002). And in Aguirre-Aguirre, the criminal acts of burning buses, assaulting passengers and vandalizing property outweighed the political motive of protesting the Guatemalan government. 526 U.S. at 418, 119 S.Ct. 1439, petition denied on remand at 191 F.3d 998, 998 (9th Cir. 1999). That Berhane’s acts were comparatively less violent than these other crimes does not innoculate him from the serious-nonpolitical-crime bar, but it does suggest that the Board ought to explain why he falls on the wrong side of the line — if indeed he does. And that is particularly true given the prevalence of rock throwing as a form of street protest.
Neither the Board nor the Immigration Judge, moreover, addressed one of Berhane’s principal arguments: that his rock throwing was an act of self defense and was never directed at civilians. At one point in his testimony, Berhane explained that he would throw rocks only “if the police [were] violent and if they start[ed] hitting [Coalition] members.” JA 89. A theory of self defense, it is true, does not show that his actions were political. But it might diminish the criminal nature of the actions, which weighs in the balance. The Board must address the point in the first instance.
It is not lost on us that the Board deserves considerable deference in deciding what amounts to a “serious nonpolitical crime.” The Board, not the judiciary, is best suited to engage in the difficult weighing of an applicant’s political motives against the criminal nature of his actions. And the decision to characterize certain crimes “committed in another country as political in nature,” and to therefore “allow the perpetrators to remain in the United States,” is an “especially sensitive” determination that could affect diplomatic relations with that country. Aguirre-Aguirre, 526 U.S. at 425, 119 S.Ct. 1439 (internal quotation marks omitted). But the Board’s discretion, even broad discretion, to make these assessments still requires it to provide a reasoned explanation for barring some asylum seekers and not others. Deference requires upholding a Board decision even when it is not the choice we would have made so long as there is a reasonable path for reaching it. It does not require upholding a Board decision without regard to whether there is a reasoned basis for it, and it does not require us to envision a rational explanation ourselves. Board decisions are upheld when the agency has exercised reasoned discretion, not as a matter of grace, and the Board must offer sufficient reasons for allowing us to distinguish between the two.
IV.
For these reasons, we vacate the Board’s decision and remand the case for further review.