RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0241a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ZAMIRA BARBAKOVNA JAPARKULOVA,

                   *Petitioner,*

    *v.*

ERIC H. HOLDER, JR.,

                   *Respondent.*

No. 09-3583

On Petition for Review of an Order
of the Board of Immigration Appeals.
No. A095 574 202 Cincinnati.

Argued: June 8, 2010

Decided and Filed: August 11, 2010

Before: MARTIN, RYAN, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Charleston C. K. Wang, LAW OFFICES, Cincinnati, Ohio, for Petitioner. Rosanne M. Perry, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Charleston C. K. Wang, LAW OFFICES, Cincinnati, Ohio, for Petitioner. Greg D. Mack, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

    KETHLEDGE, J., delivered the opinion of the court, in which RYAN, J., joined. MARTIN, J. (pp. 10-16), delivered a separate opinion concurring in part and dissenting in part.

_____

## AMENDED OPINION

_____

    KETHLEDGE, Circuit Judge. Zamira Japarkulova, a native and citizen of the Kyrgyz Republic, petitions for review of an order of the Board of Immigration Appeals denying her application for asylum. We conclude that the Board erred by failing to

1

provide a reasoned explanation for its conclusion that Japarkulova did not experience past persecution. But we also conclude that the error was harmless. We therefore deny the petition.

I.

Japarkulova was admitted into the United States as a non-immigrant visitor in September 2001. Her visa was due to expire in March 2003. In May 2002, however, Japarkulova submitted an application for asylum and withholding of removal to the Department of Homeland Security (DHS). An asylum officer denied her application in August 2003, at which point DHS issued a Notice to Appear, alleging that Japarkulova was removable for having overstayed her visa. *See* 8 U.S.C. § 1227(a)(1)(B). At a hearing before an immigration judge (IJ), Japarkulova conceded removability but renewed her requests for asylum and withholding of removal, and added an application for relief under the Convention Against Torture.

At a subsequent hearing, Japarkulova testified in support of her requests for relief. She claimed that she had been persecuted in the Kyrgyz Republic because of her opposition to the corruption of Mariam Akayeva, the wife of then-President Askar Akayev. She explained that, as a result of her advanced education and work as a university professor, she had become involved with the Kelechek Foundation, an organization founded in 1991 to provide educational support to gifted Kryrgz students. During her time with the Kelechek Foundation, Japarkulova worked closely with Akayeva, the head of the Foundation.

In roughly 1993, Japarkulova learned that Akayeva was mishandling Foundation funds. According to Japarkulova, Akayeva was selling scholarships to attend several competitive universities in the United States, even though the scholarships were supposed to be allocated based on merit. After Japarkulova raised the issue of Akayeva's corruption with the Kyrgyz Minister of Education, she was asked to visit the president's office to discuss the charge. When Japarkulova arrived for the meeting, however, security guards seized the documentation that she had brought with her. She then met with the Minister of National Security, who told her that she would be jailed

if she did not abandon her efforts to expose Akayeva's corruption. The security minister also threatened that the government would arrange a fatal "accident" for Japarkulova if she did not desist. Because of the history of political violence in her country, Japarkulova took the threat seriously.

Japarkulova also testified that she was fired from a series of jobs because of her opposition to Akayeva's corruption. Twice, her employer informed her that she was being fired due to pressure from the president. On another occasion, Japarkulova was fired shortly after Akayev visited her employer's office and found her working there. On each occasion, however, Japarkulova was able to find a new position shortly after being fired.

In 1997, Japarkulova came to the United States on a Fulbright Scholarship. She testified that she did not seek asylum at that time because she hoped that Akayev would lose an upcoming election. In 1999, she returned to the Kyrgyz Republic, where she began work as a volunteer for the opposition Ar-Namys party. Akayev won the election, however, and thereafter jailed the founder of the Ar-Namys party, Felix Kulov. Finally, in August 2001 Japarkulova received a subpoena to appear at what she later determined was a special national security office in the local police station. Rather than obey the subpoena, she fled to Moscow, where she stayed with a friend before ultimately coming to the United States.

At the close of the hearing, the IJ denied Japarkulova's applications for relief. Although the IJ credited her testimony and found that she had been mistreated because of a political opinion, he concluded that the mistreatment did not rise to the level of past persecution. The IJ also found that conditions in the Kyrgyz Republic had improved since Japarkulova left, which meant that she could not demonstrate a well-founded fear of future persecution.

The Board of Immigration Appeals affirmed in a two-page opinion. It first noted that Japarkulova had abandoned her claims for withholding of removal and Torture Convention relief by failing to discuss them in her brief. With respect to her asylum

claim, the Board adopted the IJ's reasoning, concluding that Japarkulova had not shown past persecution or a well-founded fear of future persecution.

This petition for review followed.

II.

To be eligible for asylum under the Immigration and Nationality Act (INA), an alien must demonstrate that he or she is a "refugee."  8 U.S.C. § 1158(b)(1)(A); *see* 8 C.F.R. § 1208.13(a) ("The burden of proof is on the applicant for asylum to establish that he or she is a refugee").  The INA defines  "refugee" as an alien "who is unable or unwilling to return to" his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).  Here, the Board credited Japarkulova's testimony and accepted the IJ's conclusion that the mistreatment she experienced was on account of a political opinion.  The only issues before us, therefore, are whether that mistreatment rose to the level of past persecution and, if not, whether Japarkulova demonstrated a well-founded fear of future persecution.

The INA does not define "persecution," and to our knowledge the Board has not either.  *See Sahi v. Gonzalez*, 416 F.3d 587, 588-89 (7th Cir. 2005).  Our cases have given the term some content, but mostly by identifying what does *not* count.  *See, e.g.*, *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) ("[P]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive") (alteration in original; quotation marks omitted); *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998) (persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty").  And by way of example, we have explained that "actions that might cross the line from harassment to persecution include: detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir.2005) (quotation marks omitted).

The Board was on solid ground in concluding that Japarkulova's string of job losses did not amount to persecution. Japarkulova contends that, in dismissing her claim of economic persecution, the Board ignored our decision in *Berdo v. INS*, 432 F.2d 824 (6th Cir. 1970), and its own precedential decision in *In re T-Z-*, 24 I. & N. Dec. 163 (B.I.A. 2007). But the Board acknowledged that economic deprivation will sometimes amount to persecution; it held that Japarkulova's job losses were not persecution because she did not show that "'the resulting conditions [were] sufficiently severe.'" Board Op. at 1 (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 624 n.9 (6th Cir. 2004)). As the Board noted, although Japarkulova was fired from a series of jobs, on each occasion she moved quickly to another high-level position in the Kyrgyz economy. This was not persecution. *See Berdo*, 432 F.2d at 846 (observing that the "deliberate imposition of *substantial* economic disadvantage" may constitute persecution) (emphasis added; quotation marks omitted); *Daneshvar*, 355 F.3d at 624 (finding no persecution where, because of discrimination, alien could not work for the government but could find employment in the private sector).

More problematic, however, was the Board's treatment of the threat Japarkulova received from President Akayev's security minister. After the IJ's opinion failed to mention the incident, the Board said that "the threats or harassment [Japarkulova] received do not amount to persecution," reasoning that persecution requires "'more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty.'" Board Op. at 1-2 (quoting *Ndrecaj v. Mukasey*, 522 F.3d 667, 674 (6th Cir. 2008)). But Japarkulova was threatened with death (albeit implicitly) if she did not abandon her attempts to expose Akayeva's corruption. The threat, moreover, came from the highest reaches of her country's government. Without further explanation, it is hard to understand the Board's conclusion that this treatment amounted only to "verbal harassment or intimidation."

Perhaps the Board read our cases to suggest that a threat, unaccompanied by physical abuse, could never amount to persecution. But that proposition runs contrary

to a number of cases, from this circuit and others, which observe that physical abuse is not an absolute prerequisite to a finding of persecution.  *See, e.g.*, *Ouda v. INS*, 324 F.3d 445, 454 (6th Cir. 2003); *Li v. Attorney General*, 400 F.3d 157, 164-65 (3d Cir. 2005); *Lim v. INS*, 224 F.3d 929, 936-37 (9th Cir. 2000); *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997).  It is also a doubtful reading of the statutory term.  When members of a minority sect are credibly threatened with death if they do not convert to the majority faith, it seems natural to say that they have been persecuted even if they choose accommodation rather than martyrdom.  *See Kantoni v. Gonzales*, 461 F.3d 894, 898 (7th Cir. 2006) ("A credible threat that causes a person to abandon lawful political or religious associations or beliefs is persecution").

So it fell to the Board to explain why the death threat Japarkulova received was not of the sort that would qualify as past persecution—or to clarify, notwithstanding the cases cited above, that a threat standing alone can never be persecution.  Had it done so, its resolution of the issue might have received *Chevron* deference, which we accord to the Board "as it gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.'"  *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987)); *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984).  (We say *might* because the Board's decision here was a non-precedential, single-member order, which several courts have held are not entitled to *Chevron* deference.  *See, e.g.*, *Rotimi v. Gonzalez*, 473 F.3d 55, 57 (2d Cir. 2007) (per curiam); *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1014 (9th Cir. 2006).)  But the Board bypassed the issue altogether, leaving us without the reasoned explanation that is a predicate to deferential review.  *Berhane v. Holder*, 606 F.3d 819, 825 (6th Cir. 2010); *Gjyzi v. Ashcroft*, 386 F.3d 710, 714 (6th Cir. 2004).

In the ordinary case that error would require a remand to the Board for further consideration, since under the *Chenery* doctrine a reviewing court ordinarily should not uphold administrative action based on reasons different from those given by the agency.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 88-89 (1943); *SEC v. Chenery Corp.*, 332 U.S.

194, 196 (1947); *see also INS v. Ventura*, 537 U.S. 12, 16-17 (2002); *Shkabari v. Gonzales*, 427 F.3d 324, 327-28 (6th Cir. 2005). But even when the agency's reasoning was inadequate, its decision may be upheld on the basis of harmless error if the petitioner's prospects are otherwise so weak that there is no "reason to believe that . . . remand might lead to a different result." *Shkabari*, 427 F.3d at 328 (quotation marks omitted); *see Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007). And for several reasons, we conclude that the Board's error was harmless here.

The cases recognizing that threats can sometimes amount to persecution emphasize that they will do so only in exceptional cases. "In the vast majority of cases, . . . mere threats will not, in and of themselves, compel a finding of past persecution." *Boykov*, 109 F.3d at 416. Instead, so-called "unfulfilled threats" will ordinarily be "more properly viewed as indicative of the danger of future persecution." *Id.*; *see also Lim*, 224 F.3d at 936 ("Threats standing alone . . . constitute past persecution in only a small category of cases"); *Li*, 400 F.3d at 165 (same). Only "threats of a most immediate and menacing nature" can possibly qualify as past persecution. *Boykov*, 109 F.3d at 416; *see also Lim*, 224 F.3d at 936 (threats will qualify as persecution only when they "are so menacing as to cause significant actual suffering or harm") (quotation marks omitted); *Li*, 400 F.3d at 165 (to qualify as persecution, threats must be "sufficiently imminent or concrete").

Here, the security minister threatened that, if Japarkulova continued her efforts to expose Akayeva's corruption, the government would arrange for a fatal "accident." Although the threat was ominous, particularly in a country with a history of political violence, it was not the sort of "immediate and menacing" threat that amounts to persecution standing alone. *Boykov*, 109 F.3d at 416. Moreover, the incident occurred in either 1993 or 1994, and Japarkulova did not flee the Kyrgyz Republic for good until 2001. That long delay, during which Japarkulova did not suffer any physical mistreatment from the government, lessens the severity of the threat. *See Lim*, 224 F.3d at 936. Finally, the minister's threat did not lead Japarkulova to abandon her political opposition to the Akayev regime. Indeed, she later worked as a volunteer for the Ar-

Namys opposition party. Thus, there is no indication that Japarkulova was able to avoid violence only by abandoning her "lawful political . . . associations or beliefs." *Kantoni*, 461 F.3d at 898. Under these circumstances, we see no reasonable prospect that "remand might lead to a different result," *Shkabari*, 427 F.3d at 328, and we therefore conclude that the Board's error was harmless.

That leaves only the Board's conclusion that Japarkulova did not establish a well-founded fear of future persecution if removed to the Kyrgyz Republic. We give that decision substantial-evidence review. *See Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004). The Board's conclusion was based on the IJ's finding that conditions in the Kyrgyz Republic had improved since Japarkulova departed in 2001. Citing the State Department's 2006 country report, the IJ noted that President Akayev's regime was ousted in March 2005 and that a new president, Kurmanbek Bakiyev, was elected in July 2005. The IJ also discussed the government's treatment of the Ar-Namys party, relying on a supplemental letter filed by the State Department. The IJ observed that the party's founder, Felix Kulov, had been released from prison when Akayev's regime fell, and that he later served as prime minister for several years. The IJ also noted that the party remained active in the Kyrgyz Republic and that the State Department was not aware of residual discrimination against its members. He thus saw no risk of persecution on account of Japarkulova's membership in the party.

In contending that she continues to face persecution in the Kyrgyz Republic even though President Akayev is no longer in power, Japarkulova suggested that Akayev's successor, President Bakiyev, maintained ties to Akayeva and was implicated in some of her corrupt dealings. But that argument suggests, at most, that conditions did not improve as much as one might have expected given that President Akayev is out of power; it offers no reason to think that conditions have actually gotten *worse*. Substantial evidence supports the Board's conclusion that Japarkulova did not establish a well-founded fear of future persecution.

\*     \*     \*

In closing, we acknowledge that current events may have overtaken our decision in this case.  President Bakiyev's regime was itself overthrown in April 2010, following bloody antigovernment protests throughout the Kyrgyz Republic.  But that development is beside the point for the purposes of our decision, because a court of appeals must decide an alien's petition for review "only on the administrative record."  8 U.S.C. § 1252(b)(4)(A).  If Japarkulova believes that recent events in the Kyrgyz Republic have affected her eligibility for asylum, her proper recourse is to file a motion to reopen her removal proceedings with the Board.

The petition for review is denied.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

BOYCE F. MARTIN, JR., Circuit Judge, concurring in part and dissenting in part. I dissent from the majority with regard to its reasoning and conclusion as to the issue of the physical persecution against Zamira Japarkulova. However, I must concur with the majority with regard to the issue of economic persecution despite the counterintuitive result required by the law in this case, though I do highlight a potential release valve.

A.    **Physical Persecution**

It is undisputed that Ms. Japarkulova was threatened, explicitly with incarceration and implicitly with death, due to her political activities and opposition. These threats came from the highest echelon of the Kyrgyz regime. She argues that these threats were "persecution" such that she qualifies as a "refugee" under 8 U.S.C. § 1101(a)(42)(A), meaning that she is entitled to asylum under 8 U.S.C. § 1158(b)(1)(A). The question, then, is whether threats of this nature qualify as persecution. As the majority points out, neither the Immigration and Nationality Act nor the agency, by regulation, interpretive opinion, or adjudicative decision, offers any guidance on when, if ever, and under what circumstances, a threat may qualify as persecution. (*Ante* at 4.)

The IJ "failed to mention" this threat (*id.* at 5), but it nevertheless concluded that Ms. Japarkulova had not experienced past persecution. The Board's opinion did not shed much more light on the subject, stating only that persecution requires something worse than what Ms. Japarkulova experienced. The Board offered no legal analysis of the statutory term and, more fundamentally, failed to explain why death threats from top government officials can never qualify as persecution. The majority correctly concludes that this failure even to identify the right question, much less answer it, "leave[s] us without the reasoned explanation that is the predicate to deferential review." (*Id.* at 6.)

Notwithstanding the Board's failure to do what is required of it, the majority nevertheless affirms on the basis of harmless error, rather than remanding for the Board to explain the basis for its ruling.  Focusing upon the fact that the relevant death threat occurred several years before Ms. Japarkulova fled the Kyrgyz Republic and did not stop her from engaging in political opposition, the majority finds it unlikely that "remand might lead to a different result." (*Id.* at 8 (quoting *Shkabari v. Gonzales*, 427 F.3d 324, 327-28 (6th Cir. 2005).)  Stated differently, the majority determines, based on its understanding of the "persecution" construct, that were the Board to engage in a reasoned analysis of whether death threats can qualify as persecution, it likely would not interpret persecution in a way that would help Ms. Japarkulova; thus, remand would be futile.

This all sounds perfectly reasonable and, indeed, I initially concurred in the majority's opinion.  But I now realize that the majority's harmless error analysis rests on a faulty premise—that it matters what federal judges interpret a word to mean in immigration cases.  The concept of "persecution" is  heady, and its definition is not self-evident.  Ask ten people to define "persecution," and you will get eleven dramatically different answers.  In the context of our immigration laws, the term carries an immense amount of historical, diplomatic, and political baggage.

The majority's definition of persecution, which is the basis for its harmless error analysis, seems reasonable to me.  It makes sense to me to say that death threats, unaccompanied by any overt act in furtherance of carrying out those threats and temporally removed from an immigrant's flight from her home country, might not qualify as persecution.  But I can only assume that my experience as a judge, always looking for causation, plays a heavy role in what does or does not make sense to me.  I am not a historian, diplomat, or politician, and some may even deem my amateur take on those subjects to be outside the mainstream, so I freely admit that what makes sense to me may not make sense to others. As the majority correctly observes, there are strong arguments why death threats from top-level government officials should be considered persecution.  (*Ante* at 6 (describing an interpretation of "persecution" that excludes

serious threats from government brass as "a doubtful reading of the statutory term").) All that is required to trigger a presumption of future persecution is being a victim of past persecution; I am aware of no authority for the proposition that the experience of persecution heals with time. So if Ms. Japarkulova likely experienced persecution at the time of the threats, what does it matter how much time has passed? Though we may find it relevant, the agency may not because the current administration or the diplomatic community or the American people may not.

All of this linguisto-philosophizing demonstrates why our deferential role in these cases is first to determine whether the agency's interpretation of loaded statutory terms—not ours—is reasonable and then to determine whether substantial evidence supports the agency's application of the facts to that reasonable interpretation. The majority's application of harmless error is antithetical to our role because, in this case, there is no agency interpretation of "persecution" to which we may defer in the face of reasoned analysis. To review for harmless error, the majority must interpret the statute de novo because the agency never has.

Though we have precedent indicating that we may review for harmless error where the agency previously has offered guidance on a statutory term but misidentifies the question or its own precedent in a particular case, we have never applied harmless error in a case like this, where we lack "the predicate for deferential review." (*Id.* (citing *Berhane v. Holder*, 606 F.3d 819, 825 (6th Cir. 2010)).) The majority cites *Shkabari*, 427 F.3d at 327-28, as its authority that the Sixth Circuit has applied harmless error in these kinds of cases. But a careful review of that opinion reveals that *Shkabari* is unequivocally not a harmless error case. There, like here, the initial question was whether the agency offered a reasoned explanation for its decision. *Id.* at 328. Unlike our case, however, the *Shkabari* Court determined that the agency's explanation, while not the model of clarity, was sufficient to allow for appellate review. *Id.* Thus, *Shkabari* is a no-error case rather than a harmless error case. To be sure, *Shkabari* frames the test for determining whether there is error to hinge on whether the error would be harmless, *i.e.* whether "there is reason to believe that the remand might lead to a different result."

*Id.* (citations and quotation marks omitted). This reasoning is admittedly circular, so the majority cannot be faulted for assuming that, if it sounds like a harmless error case, it must be a harmless error case. But the fact remains that it is not. Thus, the majority breaks new ground when it applies harmless error to Ms. Japarkulova's claim.

Breaking new ground is certainly not verboten as a general proposition, though the analysis should not rely solely upon an inapposite case like *Shkabari*. However, in this case, the majority's ground-breaking is unjustifiable because it runs afoul of binding precedent. In *Berhane*, the question was whether rock-throwing during a protest qualified as a "serious nonpolitical crime" under 8 U.S.C. §§ 1158(b)(2)(A)(iii), 1231(b)(3)(B)(iii). 606 F.3d at 823. So, like this case, the question in *Berhane* was whether a set of facts fit within the definition of a statutory term. Also like this case, there was no prior agency interpretation that would guide the inquiry. *Id.* at 824. Finally, and again like the death threat in this case, as the majority notes, there were reasonable factual and legal arguments both ways about whether rock-throwing was a serious nonpolitical crime or a form of political expression. *Id.* at 823-25.

I see no material difference between this case and *Berhane*—both involve application of a statutory term for which there was no prior agency interpretation or guidance in a case in which there were credible arguments going both ways. In *Berhane*, the agency found that rock-throwing was a serious nonpolitical activity and thus found against the petitioner. However, its reasoning was unclear and prevented this Court from performing the required deferential review of the agency interpretation. *Id.* at 825. This too parallels the majority's conclusion in this case that the agency's reasoning failed to provide "the predicate for deferential review." (*Ante* at 6.) In light of this set of circumstances, the *Berhane* majority stated,

> It is not lost on us that the Board deserves considerable deference. . . .
> But the Board's discretion, even broad discretion, to make these
> assessments still requires it to provide a reasoned explanation for barring
> some asylum seekers and not others. Deference requires upholding a
> Board decision even when it is not the choice we would have made so
> long as there is a reasonable path for reaching it. It does not require
> upholding a Board decision without regard to whether there is a reasoned

basis for it, and it does not require us to envision a rational explanation ourselves. Board decisions are upheld when the agency has exercised reasoned discretion, not as a matter of grace, and the Board must offer sufficient reasons for allowing us to distinguish between the two.

606 F.3d at 825 (emphasis added). The Court therefore remanded the case to the agency for a reasoned explanation of its decision. *Id.* This unequivocally refutes the notion that we can ignore the agency's failure to fulfill its interpretive duty under the guise of harmless error.

In light of the majority's extension of harmless error review to these kinds of cases, I do not see what is left of *Berhane*. When are we to remand under *Berhane* instead of citing to *Japarkulova* to say "no harm, no foul," and vice versa? Perhaps the only silver lining is that the majority's expansion of our authority to cut the agency out of the interpretive process is not a one-way ratchet—just as we can now use our own analysis to justify the result reached by the agency, so too can we now use our own analysis to find in favor of the immigrant instead of allowing the agency a mulligan by remand.

**B.     Economic Persecution**

As to Ms. Japarkulova's claim of economic persecution, I must concur with the majority. Given the state of our law at this time, it is impossible for us to grant her the review that is obviously prompted by the changed circumstances in her country of origin.

However, those who have read a newspaper or watched the news recently may be startled by the outcome of this case.[1] Certainly the State Department's Country Report for the Kyrgyz Republic from 2006 no longer describes the current Kyrgyzstan. Kyrgyzstan has ousted President Kurmanbek Bakiyev in a violent revolt, and a new government has been installed. As such, it would be hard to state that changed country conditions as of 2006 should definitively compel the conclusion that Ms. Japarkulova

---

[1]Recently, the New York Times reported days of violence in Kyrgyzstan, with Uzbeks and Kyrgyz rioting in the south. Michael Schwirtz, *Ethnic Rioting Ravages Kyrgyzstan*, THE NEW YORK TIMES, at A1 (June 15, 2010) (available at http://www.nytimes.com/2010/06/14/world/asia/14kyrgyz.html).

does not have a well-founded fear of future persecution in the situation that will exist in the new administration.

Counterintuitively, there is no statutory basis for this Court to remand an immigration case for additional fact finding to avoid a result, such as this one, based on a stale, false factual predicate. *Fang Huang v. Mukasey*, 523 F.3d 640, 656 (6th Cir. 2008). Despite the fact that our immigration system moves at an unconscionably glacial pace, Congress has "'explicitly revoked [the court's] authority to remand to the BIA for the taking of additional evidence.'" *Id.* (quoting *Xiao Xing Ni v. Gonzales*, 494 F.3d 260, 264-65 (2d Cir. 2007)). The Board frequently only reviews appeals several years after the relevant immigration proceedings have taken place, so the administrative record is perpetually stale. *See Berishaj v. Ashcroft*, 378 F.3d 314, 329-32 (3d Cir. 2004) (explaining in detail the problems involved with the review of stale administrative records). Thus, and although we possess an inherent equitable power to remand a matter for fact-finding in some situations, *Nesterov v. Dep't of Homeland Sec.*, 335 F. App'x 590, 594 (6th Cir. 2009) (citing *Fang Huang v. Mukasey*, 523 F.3d 640, 656 (6th Cir. 2008)), it is inappropriate for the court to exercise its equitable power when there is an alternative procedure in place to consider this new evidence. *Id.*

While I may not cut through this Gordian Knot, it is possible for petitioners to untie it themselves. Congress has left open a procedure by which a petitioner like Ms. Japarkulova, whose country conditions may have changed drastically subsequent to the relevant State Department Country Report, may have her claim addressed by the Board. Congress permits reopening of asylum proceedings "based on changed country conditions arising in the country of nationality or the country to which removal has been ordered." 8 U.S.C. § 1229a(c)(6)(C)(ii) (permitting aliens to move to reopen proceedings on the basis of "new facts"); *see also* 8 C.F.R. § 1003.2(c)(3)(ii) (permitting an alien or the government to move the BIA to reopen proceedings, and authorizing the BIA to do so *sua sponte* "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered"). A petitioner may file a motion to reopen with the Board "within 90 days of the date of entry of a final

administrative order of removal." *Nesterov*, 335 F. App'x at 591 (citation omitted); *see also* 8 U.S.C. § 1229a(c)(7)(C)(i)).  If a petitioner is beyond the ninety-day time limit, an exception may exist where the motion "is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding."  8 U.S.C. § 1229a(c)(7)(C)(ii).

Thus, while the law prohibits me from voting to provide Ms. Japarkulova relief in this case, I take some comfort in the fact that hers appears to be a prime candidate for a motion to reopen so as to address this obvious failing in our Byzantine immigration laws.