CONCURRING IN PART AND DISSENTING IN PART
BOYCE F. MARTIN, JR., Circuit Judge,
concurring in part and dissenting in part.
I dissent from the majority with regard to its reasoning and conclusion as to the issue of the physical persecution against Zamira Japarkulova. However, I must concur with the majority with regard to the issue of economic persecution despite the counterintuitive result required by the law in this case, though I do highlight a potential release valve.
A. Physical Persecution
It is undisputed that Ms. Japarkulova was threatened, explicitly with incarceration and implicitly with death, due to her political activities and opposition. These threats came from the highest echelon of the Kyrgyz regime. She argues that these threats were “persecution” such that she qualifies as a “refugee” under 8 U.S.C. § 1101(a)(42)(A), meaning that she is entitled to asylum under 8 U.S.C. § 1158(b)(1)(A). The question, then, is whether threats of this nature qualify as *703 persecution. As the majority points out, neither the Immigration and Nationality Act nor the agency, by regulation, interpretive opinion, or adjudicative decision, offers any guidance on when, if ever, and under what circumstances, a threat may qualify as persecution. (Ante at 699.)
The IJ “failed to mention” this threat (id. at 699-700), but it nevertheless concluded that Ms. Japarkulova had not experienced past persecution. The Board’s opinion did not shed much more light on the subject, stating only that persecution requires something worse than what Ms. Japarkulova experienced. The Board offered no legal analysis of the statutory term and, more fundamentally, failed to explain why death threats from top government officials can never qualify as persecution. The majority correctly concludes that this failure even to identify the right question, much less answer it, “leave[s] us without the reasoned explanation that is the predicate to deferential review.” (Id. at 701.)
Notwithstanding the Board’s failure to do what is required of it, the majority nevertheless affirms on the basis of harmless error, rather than remanding for the Board to explain the basis for its ruling. Focusing upon the fact that the relevant death threat occurred several years before Ms. Japarkulova fled the Kyrgyz Republic and did not stop her from engaging in political opposition, the majority finds it unlikely that “remand might lead to a different result.” (Id. at 701) (quoting Shkabari v. Gonzales, 427 F.3d 324, 327-28 (6th Cir.2005).) Stated differently, the majority determines, based on its understanding of the “persecution” construct, that were the Board to engage in a reasoned analysis of whether death threats can qualify as persecution, it likely would not interpret persecution in a way that would help Ms. Japarkulova; thus, remand would be futile.
This all sounds perfectly reasonable and, indeed, I initially concurred in the majority’s opinion. But I now realize that the majority’s harmless error analysis rests on a faulty premise — that it matters what federal judges interpret a word to mean in immigration cases. The concept of “persecution” is heady, and its definition is not self-evident. Ask ten people to define “persecution,” and you will get eleven dramatically different answers. In the context of our immigration laws, the term carries an immense amount of historical, diplomatic, and political baggage.
The majority’s definition of persecution, which is the basis for its harmless error analysis, seems reasonable to me. It makes sense to me to say that death threats, unaccompanied by any overt act in furtherance of carrying out those threats and temporally removed from an immigrant’s flight from her home country, might not qualify as persecution. But I can only assume that my experience as a judge, always looking for causation, plays a heavy role in what does or does not make sense to me. I am not a historian, diplomat, or politician, and some may even deem my amateur take on those subjects to be outside the mainstream, so I freely admit that what makes sense to me may not make sense to others. As the majority correctly observes, there are strong arguments why death threats from top-level government officials should be considered persecution. (Ante at 700-01 (describing an interpretation of “persecution” that excludes serious threats from government brass as “a doubtful reading of the statutory term”).) All that is required to trigger a presumption of future persecution is being a victim of past persecution; I am aware of no authority for the proposition that the experience of persecution heals with time. So if Ms. Japarkulova likely experienced persecution at the time of the *704 threats, what does it matter how much time has passed? Though we may find it relevant, the agency may not because the current administration or the diplomatic community or the American people may not.
All of this linguisto-philosophizing demonstrates why our deferential role in these cases is first to determine whether the agency’s interpretation of loaded statutory terms — not ours — is reasonable and then to determine whether substantial evidence supports the agency’s application of the facts to that reasonable interpretation. The majority’s application of harmless error is antithetical to our role because, in this case, there is no agency interpretation of “persecution” to which we may defer in the face of reasoned analysis. To review for harmless error, the majority must interpret the statute de novo because the agency never has.
Though we have precedent indicating that we may review for harmless error where the agency previously has offered guidance on a statutory term but misidentifies the question or its own precedent in a particular case, we have never applied harmless error in a case like this, where we lack “the predicate for deferential review.” (Id. (citing Berhane v. Holder, 606 F.3d 819, 825 (6th Cir.2010)).) The majority cites Shkabari, 427 F.3d at 327-28, as its authority that the Sixth Circuit has applied harmless error in these kinds of cases. But a careful review of that opinion reveals that Shkabari is unequivocally not a harmless error case. There, like here, the initial question was whether the agency offered a reasoned explanation for its decision. Id. at 328. Unlike our case, however, the Shkabari Court determined that the agency’s explanation, while not the model of clarity, was sufficient to allow for appellate review. Id. Thus, Shkabari is a no-error case rather than a harmless error case. To be sure, Shkabari frames the test for determining whether there is error to hinge on whether the error would be harmless, i.e. whether “there is reason to believe that the remand might lead to a different result.” Id. (citations and quotation marks omitted). This reasoning is admittedly circular, so the majority cannot be faulted for assuming that, if it sounds like a harmless error case, it must be a harmless error case. But the fact remains that it is not. Thus, the majority breaks new ground when it applies harmless error to Ms. Japarkulova’s claim.
Breaking new ground is certainly not verboten as a general proposition, though the analysis should not rely solely upon an inapposite case like Shkabari. However, in this case, the majority’s ground-breaking is unjustifiable because it runs afoul of binding precedent. In Berhane, the question was whether rock-throwing during a protest qualified as a “serious nonpolitical crime” under 8 U.S.C. §§ 1158(b)(2)(A)(iii), 1231(b)(3)(B)(iii). 606 F.3d at 823. So, like this case, the question in Berhane was whether a set of facts fit within the definition of a statutory term. Also like this case, there was no prior agency interpretation that would guide the inquiry. Id. at 824. Finally, and again like the death threat in this case, as the majority notes, there were reasonable factual and legal arguments both ways about whether rock-throwing was a serious nonpolitical crime or a form of political expression. Id. at 823-25.
I see no material difference between this case and ■ Berhane — both involve application of a statutory term for which there was no prior agency interpretation or guidance in a case in which there were credible arguments going both ways. In Berhane, the agency found that rock-throwing was a serious nonpolitical activity and thus found against the petitioner. However, its rea *705 soning was unclear and prevented this Court from performing the required deferential review of the agency interpretation. Id. at 825. This too parallels the majority’s conclusion in this case that the agency’s reasoning failed to provide “the predicate for deferential review.” (Ante at 701.) In light of this set of circumstances, the Berhcme majority stated,
It is not lost on us that the Board deserves considerable deference.... But the Board’s discretion, even broad discretion, to make these assessments still requires it to provide a reasoned explanation for barring some asylum seekers and not others. Deference requires upholding a Board decision even when it is not the choice we would have made so long as there is a reasonable path for reaching it. It does not require upholding a Board decision without regard to whether there is a reasoned basis for it, and it does not require us to envision a rational explanation ourselves. Board decisions are upheld when the agency has exercised reasoned discretion, not as a matter of grace, and the Board must offer sufficient reasons for allowing us to distinguish between the two.
606 F.3d at 825 (emphasis added). The Court therefore remanded the case to the agency for a reasoned explanation of its decision. Id. This unequivocally refutes the notion that we can ignore the agency’s failure to fulfill its interpretive duty under the guise of harmless error.
In light of the majority’s extension of harmless error review to these kinds of cases, I do not see what is left of Berhcme. When are we to remand under Berhcme instead of citing to Japarkulova to say “no harm, no foul,” and vice versa? Perhaps the only silver lining is that the majority’s expansion of our authority to cut the agency out of the interpretive process is not a one-way ratchet — just as we can now use our own analysis to justify the result reached by the agency, so too can we now use our own analysis to find in favor of the immigrant instead of allowing the agency a mulligan by remand.
B. Economic Persecution
As to Ms. Japarkulova’s claim of economic persecution, I must concur with the majority. Given the state of our law at this time, it is impossible for us to grant her the review that is obviously prompted by the changed circumstances in her country of origin.
However, those who have read a newspaper or watched the news recently may be startled by the outcome of this case.[1] Certainly the State Department’s Country Report for the Kyrgyz Republic from 2006 no longer describes the current Kyrgyzstan. Kyrgyzstan has ousted President Kurmanbek Bakiyev in a violent revolt, and a new government has been installed. As such, it would be hard to state that changed country conditions as of 2006 should definitively compel the conclusion that Ms. Japarkulova does not have a well-founded fear of future persecution in the situation that will exist in the new administration.
Counterintuitively, there is no statutory basis for this Court to remand an immigration case for additional fact finding to avoid a result, such as this one, based on a stale, false factual predicate. Fang Huang v. Mukasey, 523 F.3d 640, 656 (6th Cir.2008). Despite the fact that our immigration system moves at an unconscionably *706 glacial pace, Congress has “ ‘explicitly revoked [the court’s] authority to remand to the BIA for the taking of additional evidence.’” Id. (quoting Xiao Xing Ni v. Gonzales, 494 F.3d 260, 264-65 (2d Cir.2007) ). The Board frequently only reviews appeals several years after the relevant immigration proceedings have taken place, so the administrative record is perpetually stale. See Berishaj v. Ashcroft, 378 F.3d 314, 329-32 (3d Cir.2004) (explaining in detail the problems involved with the review of stale administrative records). Thus, and although we possess an inherent equitable power to remand a matter for fact-finding in some situations, Nesterov v. Dep’t of Homeland Sec., 335 Fed.Appx. 590, 594 (6th Cir.2009) (citing Fang Huang v. Mukasey, 523 F.3d 640, 656 (6th Cir.2008) ), it is inappropriate for the court to exercise its equitable power when there is an alternative procedure in place to consider this new evidence. Id.
While I may not cut through this Gordian Knot, it is possible for petitioners to untie it themselves. Congress has left open a procedure by which a petitioner like Ms. Japarkulova, whose country conditions may have changed drastically subsequent to the relevant State Department Country Report, may have her claim addressed by the Board. Congress permits reopening of asylum proceedings “based on changed country conditions arising in the country of nationality or the country to which removal has been ordered.” 8 U.S.C. § 1229a(c)(6)(C)(ii) (permitting aliens to move to reopen proceedings on the basis of “new facts”); see also 8 C.F.R. § 1003.2(c)(3)(ii) (permitting an alien or the government to move the BIA to reopen proceedings, and authorizing the BIA to do so sua sponte “based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered”). A petitioner may file a motion to reopen with the Board “within 90 days of the date of entry of a final administrative order of removal.” Nesterov, 335 Fed.Appx. at 591 (citation omitted); see also 8 U.S.C. § 1229a(c)(7)(C)(i). If a petitioner is beyond the ninety-day time limit, an exception may exist where the motion “is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding.” 8 U.S.C. § 1229a(c)(7)(C)(ii).
Thus, while the law prohibits me from voting to provide Ms. Japarkulova relief in this case, I take some comfort in the fact that hers appears to be a prime candidate for a motion to reopen so as to address this obvious failing in our Byzantine immigration laws.

. Recently, the New York Times reported days of violence in Kyrgyzstan, with Uzbeks and Kyrgyz rioting in the south. Michael Schwirtz, Ethnic Rioting Ravages Kyrgyzstan, The New York Times, at Al (June 15, 2010) (available at http://www.nytimes.com/2010/06/ 14/world/asia/14kyrgyz.html).