**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANTHONY ALOYSIUS ALPHONSUS,
*Petitioner*,

v.

ERIC H. HOLDER, JR., Attorney
General,
*Respondent*.

No. 10-73298

Agency No.
A070-942-161

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 8, 2012—Pasadena, California

Filed January 18, 2013

Before: Harry Pregerson, Susan P. Graber,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge Graber

## SUMMARY[*]

### Immigration

The panel granted in part and denied in part a petition for review of the Board of Immigration Appeals' denial of an application for withholding of removal and protection under the Convention Against Torture to a native and citizen of Bangladesh.

The panel held that it had jurisdiction to review the Board's particularly serious crime determination under 8 U.S.C. § 1252(a)(2)(D) because petitioner's challenges were premised on constitutional and legal considerations. The panel rejected petitioner's facial constitutional challenge to the particularly serious crime statute, but held that the Board abused its discretion in concluding that petitioner's conviction for resisting arrest, in violation of Cal. Penal Code § 69, constituted a particularly serious crime, because the Board failed to adequately explain how the result in this case fits within the statutory language or any current framework created by Board precedent. The panel remanded for further consideration and explanation of the particularly serious crime issue.

The panel held that petitioner failed to establish a clear probability of torture in Bangladesh due to his Christian religion.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Judge Graber dissented from the portion of the majority opinion rejecting the Board's rationale that petitioner's crime was particularly serious because it created a meaningful risk of harm to others.  Judge Graber concurred as to the other parts of the opinion, and the result.  Judge Graber also wrote separately to suggest that the court should reconsider en banc its exception to 8 U.S.C. § 1252(a)(2)(C)'s jurisdiction stripping provisions for aggravated felons where the Board denied CAT relief on the merits.

## COUNSEL

Matthew L. Hoppock, Dunn & Davison, LLC, Kansas City, Missouri, pro bono counsel for Petitioner.

Tony West, Assistant Attorney General, Civil Division; Terri J. Scadron, Assistant Director; and Corey L. Farrell (argued), Attorney, United States Department of Justice, Washington, D.C., for Respondent.

## OPINION

BERZON, Circuit Judge:

Our case concerns the "particularly serious crime" concept embodied in our immigration statutes, recently the subject of an extensive opinion by an en banc panel of this Court.  *See Delgado v. Holder*, 648 F.3d 1095 (9th Cir. 2011) (en banc).  After deciding various other issues, *Delgado* remanded the case to the Board of Immigration Appeals ("BIA" or "Board"), concluding that the BIA had not adequately explained why the crime in that case fit into the

"particularly serious crime" category and therefore barred withholding of removal relief (and asylum relief, not here at issue) for the otherwise removable petitioner in that case. We reach a similar result here, remanding after reviewing in some detail the BIA's "particularly serious crime" precedents and determining that the Board has not adequately explained how the result in this case fits within any current framework created by those precedents.

More specifically, Anthony Aloysius Alphonsus petitions for review of a BIA decision ordering him removed to his native Bangladesh. The BIA affirmed the immigration judge's ("IJ") determination that Alphonsus is ineligible for withholding of removal and withholding under the Convention Against Torture ("CAT"), because his conviction for resisting arrest constitutes a particularly serious crime. The Board also affirmed the IJ's conclusion that Alphonsus would not likely be tortured if returned to Bangladesh and is ineligible for deferral of removal under CAT. Alphonsus challenges the BIA's determination that he was convicted of a particularly serious crime and its conclusion that he is not likely to be tortured in Bangladesh. Because the Board has not adequately explained its reasons for designating Alphonsus's conviction a particularly serious crime, we grant the petition with respect to the particularly serious crime determination and remand to the BIA for an appropriate explanation. As to Alphonsus's CAT claim for deferral of removal, we deny the petition.

## I.  Background

Alphonsus is a native and citizen of Bangladesh. Around 1976 or 1977, Muslims in Bangladesh started attacking

Alphonsus on account of his Christian beliefs.[1]  The first incident occurred when Alphonsus was roughly sixteen years old.  Several Muslims beat him severely, threatened him, and threw him off a bridge.  As a result of the fall, Alphonsus broke his leg and had to go to the hospital.  Alphonsus fled to India and stayed there for about a year.  After he returned to Bangladesh, the beatings resumed.  Alphonsus made several reports to the police; they only made fun of him, spat on him, or chased him away.

Around 1987, a group of Muslims kidnaped Alphonsus and took him to an undisclosed location; there they beat him, hit him with a machete, and threatened to kill him.  Roughly two months later, Alphonsus was beaten and stabbed in the hand.  Around this time, several of Alphonsus's friends were killed on account of their Christian beliefs.

At that point, Alphonsus decided to seek refuge in the United States.  He was admitted as a nonimmigrant on February 24, 1988, and adjusted his status to lawful permanent resident several years later.  When he last spoke with his family members in Bangladesh, around 1997, they told him that the people who had threatened him were still looking for him.

Before the events at issue in this case, Alphonsus had been convicted of several offenses, including petty theft, driving under the influence, and injury of a  spouse.  Two months after being paroled on a prior conviction, Alphonsus shoplifted about $131 of merchandise from a Rite-Aid.  As

---

[1] Neither the BIA nor the IJ made an adverse credibility finding.  We therefore assume the truth of Alphonsus's factual contentions.  *See Cole v. Holder*, 659 F.3d 762, 770 (9th Cir. 2011).

Alphonsus left the store, a police officer ordered him to stop, but he ran instead.  According to a government-submitted police report, Alphonsus ran through traffic, forcing vehicles to stop suddenly to avoid striking him.  A police officer on motorcycle approached Alphonsus and ordered him to stop running, but Alphonsus continued to flee.  Dismounting his motorcycle, the officer ran after Alphonsus, who stopped and "presented his body in a fighting type stance, even after being told numerous times by [the officer] to lay on the ground." The officer thereupon grabbed hold of Alphonsus's shirt, but Alphonsus struggled, causing the officer to lose hold of the shirt.  When the officer again tried to grab Alphonsus and "assist him to the ground," Alphonsus pushed the officer's upper body with both hands, causing the officer to land in "a medium sized flower bed."

The officer regained his balance and resumed the chase. Once again, Alphonsus darted through traffic, causing vehicles to stop suddenly.  Drawing his taser, the officer issued several commands for Alphonsus to stop.  Eventually, Alphonsus turned and raised his hands in what seemed to be "another fighting stance," but the officer successfully deployed the taser, causing Alphonsus to fall to the ground. He was taken into custody shortly thereafter.

Alphonsus was convicted of petty theft with priors, in violation of California Penal Code § 666, and resisting an executive officer, in violation of California Penal Code § 69.[2]

---

[2] California Penal Code § 69 states: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by a fine not exceeding ten

He was sentenced to sixteen months' imprisonment on each count, to run concurrently.

After Alphonsus's release, the Department of Homeland Security ("DHS") initiated removal proceedings. Because Alphonsus had two convictions for petty theft with priors, the government charged him with removability under 8 U.S.C. § 1227(a)(2)(A)(ii) as an alien who has been convicted of two crimes of moral turpitude after admission, and under § 1227(a)(2)(A)(iii) as an alien convicted of an aggravated felony, specifically a theft or burglary offense.[3] Alphonsus applied for asylum, withholding of removal, and protection under CAT. The IJ sustained both charges of removability and determined that Alphonsus's aggravated felony conviction renders him ineligible for asylum.

As to the application for relief from removal, the IJ explicitly declined to find that Alphonsus's conviction for resisting arrest constitutes an aggravated felony crime of violence. But he held that the resisting arrest conviction does constitute a "particularly serious crime," rendering Alphonsus ineligible for withholding of removal. In so holding, the IJ made two points. First, he stated: "[O]n looking at the elements of this crime, the facts and circumstances that gave rise to the crime, from the police report, the respondent's testimony, this Court is satisfied that the very nature of this type of crime, resisting an executive officer in the

---

thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment."

[3] DHS did not assert that Alphonsus's theft offenses constitute particularly serious crimes.

performance of his lawful duties, is just exactly the type of crime that makes [Alphonsus] a danger to the community. This is a particularly serious crime." Second, the IJ added: "[B]ased upon that analysis, and taking into consideration the Government's analysis that this is the type of a crime that not only is a crime against the officer, but it is a crime against the orderly pursuit of justice in the United States by its commission, that it also qualifies as a particularly serious crime."

With respect to Alphonsus's CAT claim, the IJ reviewed Alphonsus's testimony and the documentary evidence in the record. Relying on the documentary evidence, including the country reports submitted by both Alphonsus and the government, the IJ found that Alphonsus had not shown that he would more likely than not be persecuted with government acquiescence and, accordingly, denied Alphonsus's application for deferral of removal under CAT.

Alphonsus appealed to the BIA, challenging the IJ's conclusions that he is ineligible for withholding of removal and protection under CAT. A divided panel of the BIA affirmed.

The BIA agreed with the IJ's finding that Alphonsus's crime "was not only a crime against the officer, but 'a crime against the orderly pursuit of justice in the United States.'" The Board further stated that Alphonsus's actions "created a meaningful risk of harm to others and to the officer by the manner in which he tried to escape arrest." Board Member Linda Wendtland dissented in part, stating: "Although the conduct of which [Alphonsus] was convicted was reprehensible, it did not rise to a level sufficiently serious to bar him from withholding of removal."

As for Alphonsus's CAT claim, the BIA found that the IJ "aptly surveyed the country conditions evidence submitted by [Alphonsus]." Agreeing with the IJ's determination that the Bangladeshi government is making an effort to improve religious harmony in the country, the Board accordingly concluded that "the record is insufficient to demonstrate that [Alphonsus] is likely to be tortured by the government or by private actors *with the acquiescence* of governmental authorities given his status as a Pentecostal."

## II.  Jurisdiction

The government argues that the Immigration and Nationality Act's ("INA") bar to review for criminal aliens, 8 U.S.C. § 1252(a)(2)(C), deprives us of jurisdiction to review Alphonsus's challenges to the BIA's decision, as Alphonsus was ordered removed because of convictions for crimes involving moral turpitude and an aggravated felony. We need not decide whether the bar applies to Alphonsus. *See, e.g.*, *Bromfield v. Mukasey*, 543 F.3d 1071, 1075–76 & n.4 (9th Cir. 2008). Even if it did, that circumstance would not deprive us of jurisdiction over either of Alphonsus's challenges. Alphonsus's challenges are premised on constitutional and legal considerations and are not fact-based. *Compare Pechenkov v. Holder*, No. 08-73287, 2012 WL 5995430, at \*4 (9th Cir. Dec. 3, 2012). We therefore have jurisdiction over those challenges to the Board's determination that Alphonsus committed a particularly serious crime, pursuant to 8 U.S.C. § 1252(a)(2)(D). *See Anaya-Ortiz v. Holder*, 594 F.3d 673, 676, 679–80 (9th Cir. 2010). We also have jurisdiction over Alphonsus's CAT challenge, because the IJ did not rely on Alphonsus's conviction in denying deferral of removal under CAT but instead denied relief on the merits. *See Pechenkov*, 2012 WL

5995430, at \*4; *Morales v. Gonzales*, 478 F.3d 972, 980 (9th Cir. 2007).[4]

## III.  Withholding of Removal

Alphonsus raises two principal challenges to the Board's particularly serious crime determination: (1) that the particularly serious crime bar is unconstitutionally vague; and (2) that the BIA's application of the particularly serious crime bar to this case was arbitrary and capricious, because inadequately explained.  We address each contention in turn. Before doing so, we begin by surveying the history of the particularly serious crime bar, as doing so illuminates our later discussions of Alphonsus's specific arguments.

### A.  History of the Particularly Serious Crime Bar

Both the withholding of removal obligation and the particularly serious crime exception to that obligation trace their origins to Article 33 of the 1951 United Nations Convention Relating to the Status of Refugees, 19 U.S.T. 5269, 189 U.N.T.S. 150 ("the Convention").  Article 33(1) of the Convention established the obligation not to remove an alien to a country where he is likely to face persecution on account of his race, religion, nationality, membership in a particular social group, or political opinion.[5]  Article 33(2), in

---

[4] The government concedes that our precedent forecloses a jurisdictional challenge to the examination of Alphonsus's CAT claim in this case and raises the criminal alien review bar in this respect only to preserve the challenge.

[5] Article 33(1) states: "No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his

turn, enumerates two exceptions to the withholding of removal obligation established in the previous paragraph: (1) a danger to national security exception; and (2) a particularly serious crime exception.[6] Both the duty of nonremoval and the exceptions to that duty were adopted by the United States when it acceded to the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 62223, 606 U.N.T.S. 267 ("the Protocol"), which incorporates Article 33 of the Convention. *See Delgado*, 648 F.3d at 1100.

Congress subsequently passed the Refugee Act of 1980 ("the 1980 Act") to bring United States refugee law into conformance with the nation's treaty obligations under the Protocol. *See Barapind v. Reno*, 225 F.3d 1100, 1106 (9th

---

race, religion, nationality, membership of a particular social group or political opinion."

[6] Article 33(2) provides: "The benefit of the [withholding of removal] provision may not . . . be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country." Although neither the Protocol nor the Convention defines the term "particularly serious crime," one academic leading commentator on the Convention suggested that only "clearly antisocial" crimes "demonstrat[ing] a complete or near complete lack of social and moral inhibitions" may appropriately fall within the "particularly serious crime" bar contained in Article 33(2). Atle Grahl-Madsen, *Commentary on the Refugee Convention, 1951*, art. 33 cmt. 10 (1997). He provides, as examples of such crimes: "the blowing up of a passenger airplane in order to collect life insurance" or "wanton killing in a public place." *Id.* In *INS v. Cardoza-Fonseca*, the Supreme Court referred to Professor Grahl-Madsen as a "leading authority" and invoked his analysis. *See* 480 U.S. 421, 431 (1987) (citing 1 A. Grahl-Madsen, *The Status of Refugees in International Law* 180 (1966)).

Cir. 2000).  The 1980 Act amended § 243(h) of the INA to read, in relevant part:

> (1) The Attorney General shall not deport or return any alien (other than an alien described in section 241(a)(19)) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

> (2) Paragraph (1) shall not apply to any alien if the Attorney General determines that—,

> (A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

> *(B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;*

> (C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or

>(D) there are reasonable grounds for
>regarding the alien as a danger to the security
>of the United States.

Pub. L. No. 96-212, § 203(e), 94 Stat. 102, 107 (1980) (emphasis added).

*Matter of Frentescu*, the BIA's seminal decision interpreting the meaning of "particularly serious crime" under the 1980 Act, observed that neither the Act nor the Protocol nor the *Handbook on Procedures and Criteria for Determining Refugee Status* (Geneva, 1979) ("the *Handbook*") defined the term. 18 I. & N. Dec. 244, 245–46 (B.I.A. 1982).[7] The BIA pointed out, however, that "the specific language chosen by Congress reflects that a 'particularly serious crime' is more serious than a 'serious nonpolitical crime,'"[8] and referred to the definition of "serious nonpolitical crime" found in the *Handbook*:

>What constitutes a "serious" non-political
>crime for the purposes of this exclusion clause
>is difficult to define, especially since the term

---

[7] The *Handbook*, which is issued by the United Nations High Commission for Refugees, "provides significant guidance in construing the Protocol, to which Congress sought to conform." *Cardoza-Fonseca*, 480 U.S. at 439 n.22.

[8] Like the particularly serious crime bar, the serious non-political crime bar derives from the Convention, Article 1(F)(b) of which provides that the Convention's provisions—including the protection of withholding of removal—"shall not apply to any person with respect to whom there are serious reasons for considering that . . . [h]e has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee."

"crime" has different connotations in different legal systems. In some countries the word "crime" denotes only offences of a serious character. In other countries it may comprise anything from petty larceny to murder. *In the present context, however, a "serious" crime must be a capital crime or a very grave punishable act.* Minor offences punishable by moderate sentences are not grounds for exclusion under Article 1 F(b) even if technically referred to as "crimes" in the penal law of the country concerned.

A refugee committing a serious crime in the country of refuge is subject to due process of law in that country. *In extreme cases, Article 33 paragraph 2 of the Convention permits a refugee's expulsion or return to his former home country if, having been convicted by a final judgment of a "particularly serious" common crime, he constitutes a danger to the community of his country of refuge.*

*Id.* at 245–46 (quoting *Handbook* ¶¶ 155, 154) (emphases added).

*Frentescu* neither adopted a precise definition of what constitutes a particularly serious crime nor set forth any comprehensive list of crimes falling within the definition. *Id.* at 247. The Board instead concluded that, although certain crimes are inherently "particularly serious," "the record in most proceedings will have to be analyzed on a case-by-case basis" and identified several "factors" relevant to that inquiry,

including: "the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community." *Id.* The BIA further clarified that "[c]rimes against persons are more likely to be characterized as 'particularly serious crimes,'" but cautioned that "there may be instances where crimes (or a crime) against property will be considered as such crimes." *Id.* Subsequently, in *Matter of Carballe*, 19 I. & N. Dec. 357, 359–60 (B.I.A. 1986), the Board determined that the statutory particularly serious crime provision does not require that, in addition to the determination that the alien has been convicted of a particularly serious crime, the government make an independent determination that the alien represents a future danger to the community. *See also* 8 C.F.R. § 1208.16(d)(2); *Ramirez-Ramos v. INS*, 814 F.2d 1394, 1397 (9th Cir. 1987). But *Carballe* accepted and reiterated *Frentescu*'s reliance on dangerousness as the sine qua non of a particularly serious crime, stating that the "essential key" to "determining whether a conviction is for [a particularly serious crime]" is "whether the nature of the crime is one which indicates that the alien poses a danger to the community." 19 I. & N. Dec. at 360; *see also Hamama v. INS*, 78 F.3d 233, 240 (6th Cir. 1996).

Section 515(a)(2) of the Immigration Act of 1990 ("the 1990 Act") obviated the need for a case-specific *Frentescu/Carballe* analysis for aggravated felonies by amending § 243(h)(2) of the INA to state that any "alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime." Pub. L. No. 101-649, 104 Stat. 4978, 5053 (1990); s*ee Mosquera-Perez v. INS*, 3 F.3d 553, 557 (1st Cir. 1993). The

agency "continued to adjudicate [non-aggravated felony] particularly serious crimes on a case-by-case basis." *Delgado*, 648 F.3d at 1104; *see Matter of B-*, 20 I. & N. Dec. 427, 430–31 (B.I.A. 1991).

At the time Congress passed the 1990 Act, only a small number of especially grave offenses had been designated "aggravated felonies." *See* Pub L. No. 100-690, § 7342, 102 Stat. 4181, 4469–70 (1988 version of the INA) (defining "aggravated felony" as: "murder; any drug trafficking crime, . . . or any illicit trafficking in any firearms or destructive devices"); *see also* Pub. L. No. 101-649, § 501, 104 Stat. 4978, 5048 (the 1990 Act) (adding money laundering and crimes of violence for which the term of imprisonment is at least five years to the list of aggravated felonies). In *Matter of C-*, 20 I. & N. Dec. 529, 534 (B.I.A. 1992), the BIA observed that the relatively short list of aggravated felony offenses then in existence "cover[ed] the vast majority of crimes [it] would have previously determined to be particularly serious crimes." The BIA further noted, however:

> There will of course continue to be situations requiring a determination whether a "particularly serious crime" exists under *Frentescu*; such is the case, for example, where the crime does not technically qualify as an aggravated felony under the Act based on the conviction date . . .; the withholding request precedes November 29, 1990; *or, perhaps, where the crime falls outside the*

*definition of aggravated felony but should, under the analysis of* Frentescu*, be deemed a particularly serious crime.*

*Id.* at 535 n.3 (emphasis added) (citation omitted).

The definition of "aggravated felony" under the INA did not, however, remain focused on "very" grave crimes, let alone on "extreme cases." *See Frentescu*, 18 I. & N. Dec. at 246 (quoting *Handbook* ¶¶ 155, 154). Instead, the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 214 ("AEDPA"), expanded the definition of "aggravated felony" to encompass a much wider range of offenses, thereby substantially enlarging the scope of the particularly serious crime exception through that exception's incorporation of all aggravated felonies. As a result of this expansion, Congress became concerned that some of the newly designated aggravated felonies "might be considered less serious than those the Protocol intended to cover" under the particularly serious crime exception. *Choeum v. INS*, 129 F.3d 29, 42 (1st Cir. 1997).[9] To address this concern, § 413(f) of AEDPA amended § 243(h) of the INA to allow the Attorney General to override the categorical treatment of aggravated felonies as particularly serious

---

[9] As Senator Kennedy opined when discussing a proposed amendment to an immigration bill under consideration at the same time as the AEDPA bill: "[T]o declare an aggravated felon anyone convicted of an offense involving imprisonment of one year, . . . means that people with fairly minor offenses would be ineligible to seek withholding of deportation, [which in many] instances may violate the Refugee Convention." Immigration Control and Financial Responsibility Act of 1996: Mark-up on S. 1664 before the Senate Committee on the Judiciary, 104th Cong., 2d Sess. 60–61 (1996); *see also Matter of Q-T-M-T-*, 21 I. & N. Dec. 639, 648 & n.4 (B.I.A. 1996) (en banc).

crimes, "when 'necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees.'" *Delgado*, 648 F.3d at 1104 (citing 110 Stat. at 1269).

Interpreting the relevant AEDPA provisions in *Matter of Q-T-M-T-*, 21 I. & N. Dec. 639, 653–54 (B.I.A. 1996) (en banc), the BIA held that an alien convicted of an aggravated felony or felonies and sentenced to at least five years of incarceration was conclusively convicted of a particularly serious crime and barred from withholding of removal, but that an alien convicted of an aggravated felony or felonies and sentenced to an aggregate of less than five years' imprisonment would be subject only to a rebuttable presumption that he had been convicted of a particularly serious crime, barring eligibility for withholding of removal. In applying this rebuttable presumption analysis, the BIA emphasized that it would "look to the nature and circumstances of the crime to determine whether the alien, having been convicted of that crime, can be said to represent a danger to the community of the United States." *Id.* at 654 (citing *Carballe*, 19 I. & N. Dec. at 360–61; *Frentescu*, 18 I. & N. Dec. 244).

The effect of *Matter of Q-T-M-T-* was short-lived. A few months after Congress enacted the override provision of AEDPA on which *Q-T-M-T-* rested, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub L. No. 104-208, div. C, § 305(a)(3), 110 Stat. 3009-546 ("IIRIRA"), again expanded the list of crimes designated as aggravated felonies, primarily by reducing, from five years to one, the minimum penalty necessary for several offenses to qualify as aggravated felonies. *See id.* § 321(a)(3), (10), (11). Along with this additional expansion of the aggravated felony list, Congress altered the scope of the particularly serious

crime bar by eliminating the categorical designation of aggravated felonies as particularly serious crimes for withholding of removal purposes. *See Delgado*, 648 F.3d at 1104–05; *Matter of N-A-M-*, 24 I. & N. Dec. 336, 339–40 (B.I.A. 2007). In particular, § 305(a) of the IIRIRA changed the definition of "particularly serious crime" for withholding purposes by adding the following paragraph to § 241(b)(3) of the INA:

> For purposes of clause (ii) [establishing the particularly serious bar], an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

110 Stat. at 3009-602 (codified at 8 U.S.C. § 1231(b)(3)(B)(iv)). Because the IIRIRA eliminated the categorical equation of aggravated felonies and particularly serious crimes, the BIA returned to the *Frentescu/Carballe* approach—abandoning the "rebuttable presumption" analysis of *Q-T-M-T-* —for aggravated felony convictions involving aggregate sentences of less than five years' imprisonment. *See Matter of L-S-*, 22 I. & N. Dec. 645, 651 (B.I.A. 1999). With regard to convictions for crimes other than aggravated felonies, the Board continued to apply the *Frentescu/Carballe* approach. *See id.* at 651 n.7.

The BIA subsequently held, in *Matter of N-A-M-*, that § 1231(b)(3)(B) does not limit its authority to designate a non-"aggravated felony" as a particularly serious crime. *See* 24 I. & N. Dec. at 341; *see also Delgado*, 648 F.3d at 1103–05 (extending *Chevron* deference to this interpretation of § 1231(b)(3)(B)). In describing its approach to determining whether a given crime is particularly serious, the Board stated that it continues to apply the *Frentescu* standard, with two significant modifications. *See N-A-M-*, 24 I. & N. Dec. at 342. First, the BIA explained that, "[a]s set forth in *Matter of Carballe*, the proper focus for determining whether a crime is particularly serious is on the nature of the crime and not the likelihood of future serious misconduct." *Id.* (citation omitted). Second, the Board added, "the sentence imposed is not a dominant factor in determining whether a conviction is for a particularly serious crime." *Id.* at 343 (citing *Matter of Y-L-, A-G-, R-S-R-*, 23 I. & N. Dec. 270, 273–74, 277–78 (Att'y Gen. 2002)).

As demonstrated by the BIA's continued reliance on *Carballe*, *N-A-M-* did not countenance any change in the Board's longstanding focus on dangerousness as the "essential key" to determining whether an alien's conviction constitutes a conviction for a particularly serious crime. Rather, *N-A-M-* properly distinguished "dangerousness," the pivotal standard by which particularly serious crimes are judged, from the list of factors the government may consider in determining whether that standard is met. *See id.* at 341–43. Thus, in *Delgado*, we formulated the currently operative legal standard as follows: "[A] crime is particularly serious if the nature of the conviction, the underlying facts and circumstances and the sentence imposed *justify the presumption that the convicted immigrant is a danger to the community*." 648 F.3d at 1107 (emphasis added) (citing

*N-A-M-*, 24 I. & N. Dec. at 342; *Carballe*, 19 I. & N. Dec. at 360).

## B. Vagueness

Against this background, we first evaluate Alphonsus's vagueness challenge. Alphonsus raises a facial constitutional challenge to 8 U.S.C. § 1231(b)(3)(B)(ii), maintaining that the provision is unconstitutionally vague because the statute provides no definition of "particularly serious crime." "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Although § 1231(b)(3)(B)(ii) is not a criminal statute, we entertain Alphonsus's vagueness challenge because of the harsh consequences attached to a particularly serious crime determination and the attendant denial of withholding of removal. *See Jordan v. De George*, 341 U.S. 223, 230–31 (1951) (reviewing a vagueness challenge to the "crime involving moral turpitude" designation, "in view of the grave nature of deportation").

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).[10] Thus, to succeed on a

---

[10] There are two exceptions to this rule. In the First Amendment context, the overbreadth doctrine "allows a plaintiff 'to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may

facial vagueness challenge under the Fifth Amendment's Due Process Clause, the challenger must "prove that the enactment is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'" *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982). Put another way, he must demonstrate that the "provision simply has *no* core." *Id.* (internal quotation marks omitted).[11] In evaluating whether a statute is facially vague, we take into account the Board's binding administrative constructions of the relevant provision. *See, e.g.*, *Hess v. Bd. of Parole & Post-Prison Supervision*, 514 F.3d 909, 914 (9th Cir. 2008).

---

cause others not before the court to refrain from constitutionally protected speech or expression.'" *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 949 (9th Cir. 1997) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). Additionally, "a facial challenge to an abortion statute will succeed where, 'in a *large fraction* of the cases in which [the statute] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion' (emphasis added)." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 920–21 (9th Cir. 2004) (alteration in original) (quoting *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 895 (1992)). Outside the First Amendment and abortion contexts, we have not recognized any other exceptions to *Salerno*'s "no set of circumstances" standard for facial challenges, including facial challenges premised on vagueness. *See S.D. Myers, Inc. v. City & Cnty. of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001).

[11] In *City of Chicago v. Morales*, a Supreme Court plurality cast some doubt on the "no set of circumstances" requirement for facial challenges under the void-for-vagueness doctrine. 527 U.S. 41, 55 n.22 (1999). We, however, continue to apply the "no set of circumstances" standard "[u]ntil a majority of the Supreme Court directs otherwise." *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 U.S. 959, 972 (9th Cir. 2003).

Contrary to Alphonsus's submission, § 1231(b)(3)(B)(ii) most certainly has a core set of criminal convictions to which it applies. First, and most importantly, the statutory text indicates that the key to determining whether a crime is particularly serious is whether the nature of the crime shows that the alien poses a danger to the community of the United States. *See* 8 U.S.C. § 1231(b)(3)(B)(ii). The BIA has interpreted the statute accordingly, emphasizing that harm to persons is the usual requisite danger, while leaving open the possibility that some crimes involving injury to property may also be included. *See L-S-*, 22 I. & N. Dec. at 655–56; *Carballe*, 19 I. & N. Dec. at 360; *Frentescu*, 18 I. & N. Dec. at 247.

Second, the statute incorporates by reference numerous specific examples of the sort of convictions likely to result in a particularly serious crime determination. Title 8 U.S.C. § 1231(b)(3)(B)(iv) states that "an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime." Section 1101(a)(43), in turn, specifies which generic crimes qualify as aggravated felonies. The aggravated felony definitions serve both to delineate the group of *per se* particularly serious crimes and to suggest the types of crimes most likely to be covered by the statute even when the aggregate sentence is less than five years.

Third, the BIA has specified at least one category of offenses—drug trafficking crimes—which will almost always be particularly serious crimes for withholding purposes. *See Matter of Y-L-*, 23 I. & N. Dec. at 276.

In sum, § 1231(b)(3)(B) does cover an ascertainable core set of convictions, and the BIA's interpretive glosses have added some specificity as well. *See United States v. Sandsness*, 988 F.2d 970, 971 (9th Cir. 1993) (rejecting a facial vagueness challenge to a statute proscribing the sale of drug paraphernalia in interstate commerce, because the statute "lists 15 different examples of items which would be considered 'drug paraphernalia'" and "sets out eight factors to be considered in characterizing items as 'drug paraphernalia'"). There is, to be sure, "doubt as to the adequacy of [the particularly serious crime] standard in less obvious cases," as we demonstrate later. *Jordan*, 341 U.S. at 232. But this circumstance "does not render that standard unconstitutional for vagueness" on its face. *Id.* Rather, Alphonsus's facial challenge fails because there is an ascertainable group of circumstances as to which the statute, as interpreted, provides "an imprecise but comprehensible normative standard . . . rather [than] . . . no standard . . . at all." *Vill. of Hoffman Estates*, 455 U.S. at 495 n.7.[12]

## C.  The BIA's Particularly Serious Crime Determination

"[T]he BIA's determination that an alien was convicted of a particularly serious crime is a discretionary decision, and

---

[12] Alphonsus does not raise an as-applied vagueness challenge to § 1231(b)(3)(B)(ii) in his opening brief, nor does his reply brief object to the government's characterization of his arguments as a facial attack. Alphonsus has therefore waived any as-applied challenge. *See Rizk v. Holder*, 629 F.3d 1083, 1091 n.3 (9th Cir. 2011). Because our conclusion that the statute is not vague in at least some contexts suffices to resolve Alphonsus's facial challenge, we do not address whether the statute would be unconstitutionally vague as applied to the circumstances in this case. *See United States v. Inzunza*, 638 F.3d 1006, 1019 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 997 (2012).

we review such decisions under an abuse-of-discretion standard." *Arbid v. Holder*, No. 09-73211, 2012 WL 5458045, at \*4 (9th Cir. Nov. 9, 2012) (per curiam). Under this standard of review, "we may disturb the BIA's ruling if the BIA acted arbitrarily, irrationally, or contrary to law." *Id.* at \*5 (internal quotation marks omitted).

It is a well-settled principle of administrative law that an agency abuses its discretion if it "clearly departs from its own standards." *NLRB v. Safeway Stores, Inc.*, 622 F.2d 425, 428 (9th Cir. 1980). "We generally expect agencies to deal consistently with the parties or persons coming before them. . . . Thus, while an agency may announce new principles in an adjudicatory proceeding, it may not depart, sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case." *California Trout v. FERC*, 572 F.3d 1003, 1022–23 (9th Cir. 2009) (internal quotation marks omitted). *See also NLRB v. Nat'l Med. Hosp. of Compton*, 907 F.2d 905, 908 (9th Cir. 1990); *Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34, 36 (1st Cir. 1989) (Breyer, J.) ("The law that governs an agency's significant departure from its own prior precedent is clear. The agency cannot do so without explicitly recognizing that it is doing so and explaining why.").

More specifically, reviewing immigration determinations for an abuse of discretion, we have held that the agency acts arbitrarily if it treats factually identical cases differently without providing a reasoned explanation, *Israel v. INS*, 785 F.2d 738, 741 (9th Cir. 1986); if it includes an improper factor in its analysis, *Yepes-Prado v. INS*, 10 F.3d 1363, 1366 (9th Cir. 1993); or if it fails to "indicate how it weighed the factors involved and how it arrived at its conclusion," *id.* at 1370 (internal quotation marks omitted).

As described above, the IJ rested his particularly serious crime determination on two grounds. First, he stated—after "looking at the elements of [Alphonsus's] crime," as well as "the facts and circumstances that gave rise to the crime"—that "the very nature of this type of crime, resisting an executive officer in the performance of his lawful duties, is just exactly the type of crime that makes [Alphonsus] a danger to the community. This is a particularly serious crime." He then went on to add: "[B]ased upon that analysis, *and* taking into consideration the Government's analysis that this is the type of a crime that not only is a crime against the officer, but it is a crime against the orderly pursuit of justice in the United States by its commission, that it *also* qualifies as a particularly serious crime" (emphases added). The BIA referenced both rationales in its order affirming the IJ's decision, which stated:

> As noted by the Immigration Judge, [Alphonsus's] crime was not only a crime against the officer, but 'a crime against the orderly pursuit of justice in the United States.' [Alphonsus's] actions created a meaningful risk of harm to others and to the officer by the manner in which he tried to escape arrest. Accordingly, we agree that [Alphonsus] is ineligible for withholding of removal under 241(b)(3) of the Act and for withholding of removal under the CAT."

Reviewed for abuse of discretion, the Board's rationale suffers from two defects. First, we cannot discern, from the BIA's ambiguous statement, the operative rationale of its particularly serious crime determination. The BIA may have determined that Alphonsus's conviction for resisting arrest

constitutes a particularly serious crime because the offense interfered with the orderly pursuit of justice, or because the offense created a meaningful risk of harm, or because the offense *both* interfered with the orderly pursuit of justice *and* created a meaningful risk of harm.[13]  "Without knowing the basis of the [BIA's] decision, we cannot conduct a meaningful review.  We therefore remand to the BIA for a clear explanation."  *Delgado*, 648 F.3d at 1108.

Second, as we next explain, the BIA has not adequately elucidated *either* rationale for applying the particularly serious crime bar in this case.  On remand, then, the BIA should not only explain which rationale it is adopting, but also why that rationale is consistent with the conclusion that Alphonsus's conviction constitutes a particularly serious crime.  "In making a discretionary immigration decision, the agency must indicate how it weighed the factors involved and how it arrived at its conclusion."  *Yepes-Prado*, 10 F.3d at 1370 (internal quotation marks and citations omitted).

### i.  The "Crime Against the Orderly Pursuit of Justice" Rationale

Of the two posited rationales for designating Alphonsus's resisting arrest conviction as a particularly serious crime, we are less able to understand the meaning of the BIA's assertion that the offense is particularly serious because it constitutes

---

[13] The government argues that the Board's reference to the phrase "was, at most, a rhetorical flourish" that did not announce a new legal standard. We are not so sure.  The IJ relied heavily on the government's proposed "crime against the orderly pursuit of justice" standard, and the BIA endorsed that standard when it approvingly quoted the IJ in its opinion. At any rate, the BIA is free, on remand, to disclaim the "crime against the orderly pursuit of justice" rationale.

a "crime against the orderly pursuit of justice." Neither the IJ nor the BIA explained the significance of that locution in their respective opinions. The IJ did, however, specifically note that he expected the reviewing court to reference the government's argument to the IJ on this point in explanation of the IJ's ruling, and so we will.

The relevant transcript section shows that the government lawyer made several lengthy speeches during the hearing regarding the vital role played by California Penal Code § 69 in the community's "system of ordered liberty." He argued that the type of conduct at issue is particularly serious, "[n]ot because there was any particular danger of the person o[r] the officer being hurt, if it's really true that all [Alphonsus] was doing was fleeing," but "because it completely defeats the ability of our society to have any kind of a fair hearing on the issue of guilt or innocence, and even presents the kind of public exoneration that those who are innocent are entitled to." The government lawyer accordingly suggested that "the real victim in, actually, a very direct sense in California Penal Code Section 69 is not so much the individual person of the victim, so much as it is our entire system of justice. . . . Because if those who are charged with enforcing the law can be effectively prevented from carrying out their duties by just anyone who wishes, then, really, our entire system of justice quickly breaks down, and all of our society really is threatened with anarchy." Shortly after the government attorney finished speaking, the IJ found Alphonsus's crime particularly serious, partly because of "the reasons stated by the Government attorney."

As described above, § III.A *supra*, the BIA's consistent practice with respect to its discretionary particularly serious crime determinations has been to focus on whether the

offense at issue indicates that the alien poses a significant, nonabstract danger to the community. *See Delgado*, 648 F.3d at 1106–07 (citing *Frentescu*, 18 I. & N. Dec. at 247); *Carballe*, 19 I. & N. Dec. at 360). Explaining this standard, *Frentescu* observed that "[c]rimes against persons are more likely to be categorized as 'particularly serious crimes,'" and further added that "there may be instances where crimes (or a crime) against property will be considered as such crimes." 18 I. & N. Dec. at 247. In subsequent cases, the Board has often used the "crime against persons" rationale to justify particularly serious crime determinations. *See, e.g.*, *N-A-M-*, 24 I. & N. Dec. at 343; *L-S-*, 22 I. & N. Dec. at 649; *In re L-S-J-*, 21 I. & N. Dec. 973, 974–75 (B.I.A. 1997). To our knowledge, the BIA has never before advanced a "crime against the orderly pursuit of justice" rationale in support of its particularly serious crime determinations, even in cases where such a rationale would seem to apply. In *Denis v. Attorney General of the United States*, for example, the BIA and the Third Circuit held that an alien's conviction for tampering with evidence (by hacking up his victim's body) constituted a particularly serious crime, not because the offense interfered with the administration of justice, but because of the "gruesome brutality" of the alien's actions and the use of physical force against his victim's corpse. *See* 633 F.3d 201, 216 (3d Cir. 2011).

That an agency changes course in its statutory interpretation does not, by itself, invalidate its new conclusion. After all, "the whole point of *Chevron* [deference] is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996); *see generally Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). But to do so, an agency must

acknowledge that it is indeed changing course, and it must provide a reasoned explanation for its change of course. "Unexplained [agency] inconsistency is . . . a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *see also* 5 U.S.C. § 706(2)(A). "[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). The reasoned explanation requirement is a narrow one, "reserved for rare instances," but it applies with full force where, as here, "an agency provides no explanation at all for a change in policy." *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 493 (9th Cir. 2007) (en banc).[14]

Moreover, an agency changing course must do so in a format capable of modifying an earlier interpretation. Here, an unpublished, non-precedential opinion in this case could not modify earlier, published precedential opinions even if adequate reasons were given for the departure. *See Hernandez v. Ashcroft*, 345 F.3d 824, 846–47 (9th Cir. 2003). Thus, if the BIA is to adopt its new "crime against the orderly pursuit of justice" rationale, it must do so in a precedential opinion that modifies its earlier limitation of "particularly serious crimes" to crimes against persons and, in some cases, against property. *See Frentescu*, 18 I. & N. Dec. at 247; *see*

---

[14] Although the IJ's decision referenced the argumentative justification posited by the government lawyer in removal proceedings, the BIA's decision did not similarly state that it was adopting the government lawyer's rationale.

*also N-A-M-*, 24 I. & N. Dec. at 343; *L-S-*, 22 I. & N. Dec. at 649; *L-S-J-*, 21 I. & N. Dec. at 974–75.

One other caveat is in order with regard to the "crime against the orderly pursuit of justice" category of particularly serious crimes. The government, during oral argument before us, strongly suggested that dangerousness is not an essential touchstone for particularly serious crime determinations. This assertion contradicts the statutory text, which allows the Attorney General to deny withholding of removal if the Attorney General decides that "the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." 8 U.S.C. § 1231(b)(3)(B)(ii). As the Board recognized in *Carballe*, this phrase demonstrates that "the essential key" to determining whether a given crime is particularly serious "is whether the nature of the crime is one which indicates that the alien poses a danger to the community." 19 I. & N. Dec. at 360. If the BIA chooses to adopt the "crime against the orderly pursuit of justice" rationale, it should explain not only why it is altering its prior precedents, but also how its interpretation squares with the statutory reference to "danger."

Within the parameters just outlined, the BIA is free to modify the *Frentescu/Carballe* standard. We do not presume to proscribe any of the agency's policy choices. However, if the agency chooses to rely on the "crime against the orderly pursuit of justice" rationale, it must explain the basis for that decision. Additionally, to the extent that the Board chooses to rely on the "crime against justice" rationale, it should also explain why resisting one's own arrest, as Alphonsus did, qualifies as such a crime. *Cf. Matter of Joseph*, 22 I. & N. Dec. 799, 808 (B.I.A. 1999) (en banc) (suggesting that

resisting one's own arrest would not likely constitute generic "obstruction of justice" under 8 U.S.C. § 1101(a)(43)(S)).

### ii.  The "Meaningful Risk of Harm" Rationale

The BIA's particularly serious crime determination may also have rested on the observation that Alphonsus's "actions created a meaningful risk of harm to others and to the officer by the manner in which he tried to escape arrest." Specifically, the BIA noted that Alphonsus "ran through traffic to evade arrest, assumed a 'fighting stance' with the police officer, and shoved [the officer] when he tried to place [Alphonsus] under arrest." Moreover, the BIA pointed out, Alphonsus "was tasered by the police officer after not responding to verbal commands."[15]

As far as we are aware, the BIA has never previously addressed the circumstances under which resisting arrest

---

[15] Alphonsus does not specifically challenge the IJ's reliance on the police report. The Board held, in *Matter of N-A-M-*, that under § 1231(b)(3)(B)(ii), "all reliable information may be considered in making a particularly serious crime determination, including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction." 24 I. & N. Dec. at 342. We have deferred to that interpretation. *See Anaya-Ortiz*, 594 F.3d at 677. We have not, however, determined either: (1) whether an IJ can credit a police report, with no live evidence, over the applicant's denial in testimony of the facts stated in the report; or (2) the degree to which the IJ and BIA can rely on the specific facts alleged when those facts go entirely beyond those needed for conviction of the offense (e.g., if the police report stated that the defendant murdered the victim, but the defendant was convicted only for kidnaping), rather than elucidating the manner in which the offense was committed. Nor do we decide those questions here.

might constitute a particularly serious crime.[16] A review of the Board's precedential decisions, however, demonstrates that the "particularly serious crime" designation has generally been reserved for more grave offenses than the conduct at issue here. *See Delgado*, 648 F.3d at 1110 (Reinhardt, J., concurring).

In *Frentescu*, for example, the BIA held that burglary with intent to commit theft did not constitute a particularly serious crime, because "there [was] no indication that the dwelling was occupied or that the applicant was armed; nor [was] there any indication of an aggravating circumstance." 18 I. & N. Dec. at 247. Similarly, in *L-S-*, the Board held that the applicant's alien smuggling conviction did not constitute a particularly serious crime, even though the offense posed some risk to the alien hidden in the floor of L-S-'s van, because "there [was] no indication the [applicant] intended to harm the smuggled alien" and the applicant "did not, in fact, cause her harm." 22 I. & N. Dec. at 655–56. Here, similarly, there has been no finding of intent to harm either the arresting officer or members of the public, and it appears that in fact no one was hurt.

In *Matter of B-*, by contrast, the BIA determined that the applicant's aggravated battery conviction for injuring someone with a shot from a firearm constituted a particularly

---

[16] We have previously held that resisting arrest may, under some circumstances, constitute an aggravated felony crime of violence. *See Estrada-Rodriguez v. Mukasey*, 512 F.3d 517, 521 (9th Cir. 2007) (holding that resisting arrest, in violation of Ariz. Rev. Stat. § 13-2508, is categorically an aggravated felony crime of violence). In this case, however, the IJ explicitly refused to find that Alphonsus's conviction for resisting arrest constitutes an aggravated felony crime of violence, and the BIA did not do so either.

serious crime. 20 I. & N. Dec. at 429–30. *Matter of Garcia-Garrocho* concluded that burglary of a dwelling, during which the offender is armed with a deadly weapon or causes injury to another, constitutes a particularly serious crime. 19 I. & N. Dec. 423, 425–26 (B.I.A. 1986). And in *N-A-M-*, the Board held that felony menacing involving the use or threatened use of a deadly weapon is a particularly serious crime. 24 I. & N. Dec. at 343. Other particularly serious crime offenses include drug trafficking, *Matter of Y-L-*, 23 I. & N. Dec. at 274; possession of child pornography, *Matter of R-A-M-*, 25 I. & N. Dec. 657, 662 (B.I.A. 2012); and robbery, *Matter of S-V-*, 22 I. & N. Dec. 1306, 1308–09 (B.I.A. 2000) (en banc), *disagreed with on other grounds by Zheng v. Ashcroft*, 332 F.3d 1186, 1194–96 (9th Cir. 2003).

"The BIA acts arbitrarily when it disregards its own precedents and policies without giving a reasoned explanation for doing so." *Israel*, 785 F.2d at 740. On remand, the BIA may decide that Alphonsus's offense more closely resembles the crimes in *B-*, *Garcia-Garrocho*, *N-A-M-*, etc. than the offenses in *Frentescu* and *L-S-*, but "the Board ought to explain why he falls on the wrong side of the line—if indeed he does." *Berhane v. Holder*, 606 F.3d 819, 825 (6th Cir. 2010) (discussing the serious non-political crime bar). "The BIA may not proceed at whim, shedding its grace unevenly from case to case." *Israel*, 785 F.2d at 741 (internal quotation marks omitted).

Moreover, any such explanation must be consistent with the statutory text, which indicates that the line must be drawn so that "particularly serious crimes" are not a major proportion of crimes generally. That there are *two* modifiers to "crimes" so signifies: The crime must be not just any crime, and not just any *serious* crime—already a subset of all

crimes—but one that is "*particularly* serious." *See* 8 U.S.C. § 1231(b)(3)(B)(ii) (emphasis added).[17]  "Particularly" in this context means "in a special or unusual degree," or "to an extent greater than in other cases or towards others." *See* Webster's Third New International Dictionary 1647 (1976). We also know that a "particularly serious crime" must be more serious than a serious non-political crime, itself already a limited category. *See Frentescu*, 18 I. & N. Dec. at 247; *see also Berhane*, 606 F.3d at 824–25.  And, as we have noted, the Board has in fact generally adhered to the notion that only relatively "grave" crimes are considered "particularly serious crimes"—but not always, *see Delgado*, 648 F.3d at 1110–11 (Reinhardt, J., concurring).

As we have twice recently indicated, the BIA has discretion to exercise its broad authority to determine, on a case-by-case basis, what constitutes a particularly serious crime. *See Pechenkov*, 2012 WL 5995430, at *4; *Arbid*, 2012 WL 5458045 at *2–3.  But we retain authority under those cases, and *Delgado*, to review for the legal adequacy of the decisionmaking process.    Here, absent an adequate explanation as to how the Board's "meaningful risk of harm" rationale can be reconciled with the Board's precedents and with the statutory language, we cannot say that the Board's decision was the result of legally adequate decisionmaking.

---

[17] Our statute may well depart from the probable intent of the Convention's drafters, *see* n.6, *supra*, as § 1231(b)(3)(B)(iv)'s *per se* provision applies the particularly serious crime designation to a wide range of crimes, unified only by the requirement that the applicant must have received an aggregate sentence of at least five years' imprisonment. Thus, the presumed intent of the Convention's drafters cannot govern our analysis of the "particularly serious crime" bar, except insofar as it confirms that the bar does not extend to most crimes.

## IV. Convention Against Torture

To establish eligibility under CAT, an alien must demonstrate that he will "more likely than not" be tortured if removed to his home country.  8 C.F.R. § 1208.17; *see Abufayad v. Holder*, 632 F.3d 623, 632 (9th Cir. 2011).  The federal regulations define torture as the intentional infliction of severe pain or suffering, whether physical or mental, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.  8 C.F.R. § 1208.18(a)(1).  "Government acquiescence does not require actual knowledge or willful acceptance of torture; awareness and willful blindness will suffice." *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705–06 (9th Cir. 2010).

Alphonsus argues that the record in this case compels the conclusion that he will be tortured if returned to Bangladesh. He cites: (1) a report by the U.S. Commission on International Religious Freedom, which maintains Bangladesh on its watch list "due to the nature and extent of violations of religious freedom engaged in or tolerated by the government[]"; and (2) a 2009 United Nations High Commissioner for Refugees report stating that "[t]he Government sometimes failed to investigate the crimes and prosecute the perpetrators" of various attacks on religious minorities.

Despite the troubling country reports, the record evidence does not compel the conclusion that Alphonsus himself will be, more likely than not, *tortured* upon his return.  The two reports on which he relies make no attempt to determine the likelihood that any one member of any particular religious minority will be *tortured*—as opposed to being persecuted or

discriminated against. *Cf. Cole*, 659 F.3d at 767. Other information in the country reports, cited by both the IJ and the Board, supports the conclusion that torture of Christians by, or with the acquiescence of, the government is not more likely than not. The U.S. State Department Country Report, for example, states that religious violence has decreased in Bangladesh, that freedom of religion is protected, and that the Bangladeshi government is taking steps "to promote understanding and peaceful coexistence among different communities." The BIA may use its expertise in considering contradictory and ambiguous country reports to "decide which portions of the report[s] are relevant to the applicant." *Gonzalez-Hernandez v. Ashcroft*, 336 F.3d 995, 999 (9th Cir. 2003); *see also Go v. Holder*, 640 F.3d 1047, 1054 (9th Cir. 2011).

We accordingly conclude that substantial evidence supports the Board's determination that Alphonsus has not established that he is more likely than not to face torture if removed to Bangladesh.

## V.  Conclusion

For the foregoing reasons, we **GRANT** the petition in part, **DENY** it in part, and **REMAND** for further consideration and explanation of the "particularly serious crime" issue. Each party shall bear its own costs.

GRABER, Circuit Judge, concurring in part and dissenting in part:

I dissent from Part III.C.ii of the panel's decision, but concur as to the other parts and concur in the result. I write separately for two reasons.

1. Under Ninth Circuit precedent, we have jurisdiction to review the BIA's denial of Petitioner's claim for relief under CAT, even though 8 U.S.C. § 1252(a)(2)(C) strips federal courts of jurisdiction to review an order of removal against an alien who is removable by reason of having committed an aggravated felony, except as to legal or constitutional questions. Our court has read an additional exception into the statute's otherwise unequivocal text, under which we review such orders if the BIA did not rest its decision on the fact of the aggravated felony but instead denied relief from removal on the merits. That interpretation of § 1252(a)(2)(C) ignores the statute's text and conflicts with the views of at least four of our sister circuits.

I have discussed my objection to the judicially fashioned "on the merits" exception at greater length in my concurring opinion in *Pechenkov v. Holder*, No. 08-73287, 2012 WL 5995430, at \*5–7 (9th Cir. Dec. 3, 2012). In *Pechenkov*, this exception did not apply, so its validity was irrelevant to the result. Here, though, we assert jurisdiction over Petitioner's CAT claim because the BIA denied that claim on the merits. This case therefore squarely presents us with an opportunity to correct our flawed interpretation of 8 U.S.C. § 1252(a)(2)(C), should we take the case en banc.

2. I dissent from Part III.C.ii because, in my view, the BIA's "meaningful risk of harm" rationale applies legal

principles that are neither new nor erroneous, and because it is premised on factual considerations that, under 8 U.S.C. § 1252(a)(2)(C), we lack jurisdiction to review.

The majority relies on *Israel v. INS*, 785 F.2d 738, 740 (9th Cir. 1986), in which we reversed the denial of a petitioner's motion to reopen deportation proceedings because "[t]he BIA acts arbitrarily when it disregards its own precedents and policies without giving a reasonable explanation for doing so." The majority charges that the BIA disregarded decisions in which various crimes, committed under various circumstances, were determined to be either "particularly serious" or not. *See, e.g.*, *In re N-A-M-*, 24 I. & N. Dec. 336, 343 (B.I.A. 2007) (holding that felony menacing involving the use or threatened use of a deadly weapon was "particularly serious"); *Matter of B-*, 20 I. & N. Dec. 427, 429–30 (B.I.A. 1991) (holding that aggravated battery in which the petitioner had injured someone with a shot from a firearm was "particularly serious"); *Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (B.I.A. 1981) (holding that unarmed burglary of an apparently unoccupied building without any aggravating circumstances was not "particularly serious"). After reviewing those cases (and others), the majority concludes that the BIA committed legal error by failing to explain why Petitioner's conduct more closely resembles the crimes that were found in the past to be "particularly serious" than those that were not.

For two reasons, the majority fails to persuade me. First, *Israel* reviewed a different type of decision: whether to allow the reopening of a proceeding. 785 F.2d at 740. That question does not implicate the jurisdictional restriction imposed by 8 U.S.C. § 1252(a)(2)(C), which applies here. Because that statute prohibits us from reviewing Petitioner's

removal order except as to legal questions, we cannot overturn the BIA's particularly serious crime determination merely because we find the Board's decision to be "arbitrary" as a matter of factual application or as an exercise of judgment.

Second, even if *Israel* provides the proper framework for our review, the BIA did not depart from its precedents. To determine that Petitioner's crime was "particularly serious," the BIA applied the *Frentescu/Carballe* standard. According to that well-established legal rule, an individual's criminal conduct is "particularly serious" if "the alien, having been convicted of that crime, can be said to represent a danger to the community." *Matter of Q-T-M-T-*, 21 I. & N. Dec. 639, 654 (B.I.A. 1996) (en banc) (citing *Matter of Carballe*, 19 I. & N. Dec. 357, 360–61 (B.I.A. 1986); *Frentescu*, 18 I. & N. Dec. 244). Although "there are some crimes that are inherently 'particularly serious' while others clearly are not," for other crimes the BIA must make a case-specific determination "by considering the nature of the conviction, the circumstances and underlying facts of the conviction, the sentence imposed, and whether the type and circumstances of the crime indicate the alien will be a danger to the community." *Carballe*, 19 I. & N. Dec. at 360; *see also* *N-A-M-*, 24 I. & N. Dec. at 342 (holding that the "particularly serious crime" analysis involves consideration of "all reliable information . . . , including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction").

In this case, the BIA identified the foregoing legal standard correctly and proceeded to apply it by considering the particular facts surrounding Petitioner's crime. If the BIA purported to establish a general rule that made the crime of

resisting arrest "particularly serious" per se, we might demand that it explain why that crime categorically is more serious than other crimes that the Board has considered not to be "particularly serious." But it did not. After adequate consideration of relevant facts, the BIA held only that Petitioner's criminal conduct, under all the circumstances, was such that he could be said to present a danger to the community. Those facts included that Petitioner ran through traffic to evade arrest, assumed a "fighting stance" in relation to a police officer, shoved the officer, and required the officer to use a taser by refusing repeatedly to respond to oral commands.

I acknowledge that an agency "may not depart, sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case." *California Trout v. FERC*, 572 F.3d 1003, 1023 (9th Cir. 2009) (internal quotation marks omitted). Here, though, the agency *did* explain the result it reached, and it did so through a reasoned and reasonable application of its well-established rules for determining whether a crime is particularly serious. The fact that no previously published decision of the BIA applied those principles to the same crime or to the exact set of circumstances at issue here does not render it a "significant departure from [the agency's] own prior precedent." *Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34, 36 (1st Cir. 1989). Rather, the BIA's application of its precedent to the facts of this case was consistent with its applications of the very same analytical rules in *Matter of N-A-M-* and *Matter of B-*. In each case, the BIA rested its decision on its finding that the petitioner's conduct—which, in this case, included theft, running into traffic while fleeing from police officers, and a physical assault on a police officer—presented a danger to the

community because it created a meaningful risk of harm to others.

Whatever else they may require, *Israel* and *California Trout* do not mean that an agency commits legal error if it fails to distinguish the entire gamut of factual situations in which it has previously applied the legal standard at issue. In holding to the contrary, the majority finds legal error in what is in fact a judgment call that reflects the Board's evaluation of the specific facts of this case. I therefore cannot join Part III.C.ii.